NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0585n.06
Filed: August 16, 2006

Case No. 05-3969

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DEBORAH L. SMITH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| ALLSTATE INSURANCE COMPANY, | ) | DISTRICT OF OHIO |
| et al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: BATCHELDER, CLAY, and ROGERS, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. Plaintiff-Appellant Deborah L. Smith ("Smith") appeals from a judgment of the district court granting Defendants-Appellants Allstate Insurance Company ("Allstate") and Karl Meckert ("Meckert") summary judgment on Smith's claims of gender and race discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2; age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, *et seq.*; and retaliatory discharge, in violation of Title VII, 42 U.S.C. § 2000e-3(a), and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3). Because we conclude that Smith has failed to submit sufficient evidence to sustain her burden of persuasion on any of these claims, we affirm.

## I. Factual and Procedural History

Smith is an African-American female who was 47 years old at the time of her discharge in

2003 and had been employed by Allstate for 29 years, with the last 23 as a claims adjuster. Allstate's Claims Department conducts its activities through thirteen regional Claim Service Areas ("CSAs"). Each CSA comprises several Market Claims Offices ("MCOs"), each of which is headed by a Market Claims Manager ("MCM"). Smith worked as a property claims adjuster in Unit A of the Great Lakes Property MCO, which comprised 16 adjusters working under Frontline Performance Leader ("FPL") Karen Denny ("Denny"). Meckert is the MCM for the Great Lakes Property MCO, which is one of ten MCOs within the Crossroads CSA. Smith's job was to investigate, evaluate, and resolve property damage claims that were reported to Allstate. During the early part of 2002, Smith received an average of 140 new claims per month, though that number was reduced to about 100 claims when Allstate hired more claims adjusters later that year.

Allstate evaluates its claims adjusters' performance using a ratings system that takes into account several objective and subjective factors, which Allstate refers to as a Performance Development Summary ("PDS"). FPLs directly oversee and are responsible for evaluating the performance of claims adjusters within their units, and the MCM then reviews and signs off on an FPL's evaluation of an adjuster. In creating an adjuster's PDS rating, FPLs measure the performance of adjusters in four major skill areas and several sub-skills, and each major skill and sub-skill is assigned a numerical weight according to importance. Each sub-skill is evaluated as either "exceeds," "meets," or "requires improvement," depending on the FPL's assessment of the adjuster's performance. For a claims adjuster, the most important sub-skills (and therefore the ones that carry the most weight in the PDS rating) are timely claim investigation and customer contact, customer service, and proper file documentation. Based on the sum of the ratings within each skill area, an overall performance rating is calculated. The process of calculating an adjuster's PDS

2

rating includes personal observation, written reports on employee performance, and a review of the employee's files to determine if certain objective criteria have been met. In 2003, employees with an overall score of 85 or above received an "exceeds" PDS rating, employees with an overall score of 70 to 84.6[1] received a "meets" PDS rating, and employees with an overall score of less than 70 received a "requires improvement" ("RI") PDS rating.

Allstate says that employees with an RI rating may be placed on a formal corrective review plan in which they are evaluated in 30-day increments and allowed up to 120 days to meet specific goals. If the employee shows improvement but has not met the performance goals, an additional 30 to 60 days may be added to the corrective review plan. At the end of the review period, if the employee is unable to meet her performance goals, a job-in-jeopardy ("JIJ") notification is issued. As part of the JIJ process, the employee is given specific goals and up to 120 days to meet them. However, Allstate says that termination of the employee may occur at any time during the JIJ period if circumstances warrant such action.

Smith's work performance at Allstate seems always to have suffered from deficiencies; a supervisor rating her performance noted as early as 1987 that she had already experienced "years of inconsistent performance." Supervisors noted problems with timeliness each year from 1981 through 1984, 1988, 1989, 1994 through 1996, 1999, and 2001; thoroughness of investigation in 1982, 1983, 1987, 1988, 1995, and 2000; and reporting in 1987 through 1989, 1994, 1996, and 2000. Furthermore, Smith was given a "needs improvement" rating in 1982 and was placed on corrective review when her performance did not improve. Smith, however, testified in her deposition that she does not believe that she had any weaknesses and that there was nothing about her job performance

___

[1] While it is probably not material here, it is tempting to ponder what rating would be assigned to an employee who scored 84.7 to 84.9.

3

that she could improve upon, dismissing the opinions of her five supervisors over those years as "wrong." On the other hand, Smith also received many letters from satisfied customers and co-workers during her tenure at Allstate, and her evaluations reveal very few customer complaints over the years.

Smith's work performance issues continued during 2002 and 2003. In March 2003, Denny evaluated Smith's performance for the calendar year 2002. Smith's overall score for the annual formal PDS was 49.4, well below the 70 required for a "meets" PDS rating, and consistent with her 2002 checkpoint scores of 38.7 and 40.4.[2] As had been true throughout her career as an adjuster, Smith's key deficiencies related to timely customer contact and file documentation. Accordingly, Smith received an RI rating and was placed on a 60-day corrective review plan. Denny reviewed two other employees that received an RI rating, and both were also placed in 60-day corrective review plans.

At the end of the 60-day corrective review plan, Smith had made progress towards her work performance goals. Because Smith met the required levels for seven of her eight goals, she was allowed 30 more days to meet the required performance level of all goals. Smith's work performance deteriorated during those additional 30 days, however, and she did not meet the required performance level for three of the eight goals at the end of that period. Allstate then allowed Smith an additional 60 days to improve her work performance. At her next evaluation, Smith still did not meet the required performance level for three of the goals, and was given 30 more days to improve her performance. After Smith failed to meet the required performance levels again

---

[2]In 2002, Allstate began performing two "checkpoint" reviews of its adjusters in June and October, based on performance from January through May and January through September, though the annual review still took place in March based on performance during the entire prior calendar year. This annual "formal" review generated the PDS ratings that Allstate used to implement the Reduction in Force ("RIF") in this case.

4

– and with a checkpoint PDS rating of 43.9 – Denny placed Smith on JIJ status in October 2003. The two other employees given a formal RI rating by Denny months before in the annual review obtained a "meets" checkpoint PDS rating prior to October 2003 and were removed from the corrective review process. One of those employees, Pat Fryman, a white woman, was removed from RI status even though she had one performance goal remaining that she did not achieve, though her final review noted that "[f]ailure to maintain these results could lead to a Job in Jeopardy."

At about the same time, Allstate began experiencing substantial reductions in policy volume and claim notice counts. The company experienced an 18.3 percent reduction from the prior year in total auto notice counts, and a 29 percent drop in property notice counts, with a prediction of a 2.1 percent decline in policyholders and an overall decline in claim notice counts through 2004. Because the Crossroads CSA anticipated "a continual decline in claim notice counts," it found it necessary to reduce the number of employees working in the claims department. To accomplish this, Allstate assembled a three-person team composed of Kathleen Mahne ("Mahne"), the Claims Field Director for the Crossroads CSA from 2001-2004, and Anita Pichon-Grooms ("Pichon-Grooms") and Sybil Brenner ("Brenner"), two human resource managers, to identify which employees in the Crossroads CSA would be reduced as part of the RIF. The team utilized three weighted criteria to identify which employees would be impacted, which were, in descending order of importance: (1) business need; (2) PDS ratings; and (3) in the event of a tie, an employee's service date. As it turned out, it was not necessary to factor into any termination decision an employee's service date.

Brenner compiled a spreadsheet of impacted employees who had a formal PDS rating (as opposed to a checkpoint rating) of RI as of October 7, 2003. All 33 employees within the

Crossroads CSA – save one – with a formal RI rating at the time of the RIF were reduced, including Smith. The only exception was a field adjuster in Dayton, Ohio, who was retained because the Dayton office was experiencing a shortage of adjusters. After selecting the employees to be reduced, but prior to implementing the reduction, Allstate conducted a disparate impact analysis that it believed showed that the reduction would not result in a disparate impact based on sex, age, or race. Of the 32 impacted employees, 17 were male, 14 were under 40 years of age, and 11 were minorities. By the end of October, Allstate notified Smith and the 31 other workers who would be fired as part of the RIF, and Smith received approximately $59,016 in severance pay after Meckert personally handed her a termination letter.

Only one other employee in the Great Lakes Property MCO, David Munoz ("Munoz"), was terminated as part of the RIF. Both Smith and Munoz are members of minority racial groups and participated in a FLSA action filed in October 2002, which charged that Allstate forced certain employees to work over 40 hours per week without overtime compensation. *See Gaglione v. Allstate Ins. Co.*, case no. 5:02cv1988 (N.D. Ohio, filed Oct. 7, 2002). Meckert acknowledges that he found out about Smith's participation in the FLSA action "sometime in 2003," and Smith alleges that Mahne held a number of meetings during 2002 and 2003 requesting that employees not join the FLSA action.

After exhausting her administrative remedies, Smith brought this action on October 12, 2004. On April 11, 2005, Allstate and Meckert filed a motion for summary judgment, which the district court granted on June 30, 2005, finding (1) Smith failed to submit sufficient evidence to support a prima facie case of disparate treatment discrimination on the basis of age, sex, and race; (2) Smith failed to submit sufficient evidence to support a prima facie case of disparate impact discrimination

6

on the basis of age, sex, and race; (3) Smith failed to submit sufficient evidence to support a prima facie case of retaliatory discharge; (4) Smith failed to show that Allstate's legitimate nondiscriminatory reason for the discharge was pretextual or was not motivated by legitimate business necessity; and (5) Meckert was not a proper defendant in a Title VII action, and played no role in the decision to terminate Smith. Smith timely filed this appeal.

## II. Standard of Review

We review a district court's grant of summary judgment de novo, using the same standard under Rule 56(c) used by the district court, *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc), and we consider the record as it stood before the district court at the time of its ruling. *Niecko v. Emro Mktg. Co.,* 973 F.2d 1296, 1303 (6th Cir. 1992). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To withstand summary judgment, the non-movant must present sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

7

### III.  Title VII and ADEA Discrimination Claims

**A.  Disparate Treatment**

Title VII makes it an unlawful employment practice to "fail or refuse to hire or to discharge" an individual because of that person's race or sex.  42 U.S.C. § 2000e-2(a)(1).  Similarly, the ADEA makes it an unlawful employment practice to "fail or refuse to hire or to discharge" an individual because of that person's age.  29 U.S.C. § 623(a)(1).  In the absence of direct evidence of discrimination, Title VII and ADEA cases proceed through the familiar *McDonnell Douglas* burden-shifting framework, in which a plaintiff bears the burden of setting forth a prima facie case of discrimination, the defendant articulates a legitimate nondiscriminatory reason for the challenged action, and the plaintiff attempts to show that such reason is in fact a pretext for discrimination.  *See Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464 (6th Cir. 1990).

Ordinarily, in a Title VII case, Smith would bear the initial burden of setting forth a prima facie case of discrimination by showing that she is a member of a protected group, that she was subjected to an adverse employment action, that she was otherwise qualified for the position, and that similarly situated non-protected employees were treated more favorably.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  Similarly, under the ADEA, she would be required to show that she is age 40 or over, was subjected to an adverse employment action, was qualified for the position, and was replaced by a younger person, in order to make out a prima facie case of age discrimination.  *See Barnes*, 896 F.2d at 1465.  However, in RIF cases the fourth prong is modified to require the plaintiff to show that the employer singled her out for discharge for impermissible

reasons, as the employee is not "replaced" after a RIF.[3]  *See Barnes*, 896 F.2d at 1465; *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).

### 1.  Prima Facie Case

Allstate does not contest the district court's finding that the first three elements of the prima facie case were met, as Smith is black, female, over age 40, and – disregarding at this stage of the proceedings Allstate's reasons for terminating her – was qualified for the position.  *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (the court may not consider the employer's legitimate nondiscriminatory reason for discharging the employee at the prima facie case stage).

Smith argues that the evidence showing that the RIF operated to single her out for differing treatment includes:  (1) the fact that the lone Dayton RI-rated adjuster, a white female, was spared from the RIF; and (2) there were in fact 66 employees in the Crossroads CSA who had RI ratings, and an examination of those employees with RI ratings who were not subjected to the RIF shows that the RIF was implemented in a discriminatory manner.  We will consider only the second of these contentions, Smith having failed to argue the first to the district court.  *See Niecko*, 973 F.2d at 1299 (a party may not raise arguments that were not raised below, even if different arguments were made on the same issue) (citing *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990)).

Smith misstates the facts regarding the number of employees with RI ratings who were subjected to the RIF.  As of October 7, 2003, only the 32 people terminated, other than the spared

---

[3]This is unquestionably a RIF case, as Allstate's "business considerations cause[d] [it] to eliminate one or more positions within the company."  *Barnes*, 896 F.2d at 1465.  The discharged employees were not "replaced after [their] discharge," and "the work [was] redistributed among other existing employees already performing related work."  *Id.*

9

Dayton adjuster, had formal RI ratings. Smith identified several people – both within her unit and outside it – who performed at RI levels at some point in 2003, but fails to recognize that the criterion Allstate used to determine which employees would be subjected to the RIF was the employees who still had a *formal RI PDS rating* as of October 7, 2003.[4] Smith has also asserted that other people who received formal RI ratings in March 2003 and were placed in corrective review status were similarly situated to her and were not terminated. However, she has produced no evidence that these people were not removed from corrective review or had brought their PDS scores up to the "meets" standard before October 7 of that year.

None of the evidence Smith offers to show that she was singled out establishes that other employees were similarly situated to and treated better than Smith, and nothing presented raises any inference that an invidious motive played any part in the RIF. Because the evidence presented on the fourth prong must be "sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [her protected status]," *Barnes*, 896 F.2d at 1466, Smith has failed to meet her burden.

## 2. Legitimate Nondiscriminatory Reason and Pretext

Even if we could find that Smith met her burden, Allstate has articulated a legitimate, nondiscriminatory reason for Smith's termination, *viz.*, the RIF and its specific termination criterion of the formal RI rating as of October 7, 2003. To survive summary judgment, Smith was required to show that this proffered reason (1) has no basis in fact; (2) did not actually motivate the

---

[4]The examples Smith cited included individuals who were either assessed a checkpoint RI rating (rather than a formal rating) before October 7, 2003, were assessed a checkpoint rating after October 7, 2003, or were from outside her unit. In fact, none of those people whom Smith identified even from *outside* the unit as being similarly situated had a formal RI PDS rating on the cutoff date, as some were given formal ratings *after* October 7 and one had only a checkpoint RI rating.

defendant's conduct; or (3) was insufficient to warrant the conduct. *See Wexler*, 317 F.3d at 576. As the Supreme Court has made clear, Smith was required to provide not only evidence from which the finder of fact could conclude that Allstate's proffered reason is false, but also evidence from which the factfinder could conclude that Allstate's action was intentionally discriminatory. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."). Hence, Smith's burden was to produce evidence – whether simply the prima facie case or something additional – sufficient not only to show the falsity of Allstate's explanation, but to support the inference that the real reason for the adverse action was the prohibited factor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). Smith has wholly failed to provide evidence that Allstate's proffered explanation was false.

Smith argues that the two reasons that Allstate gave for having the RIF and for including her in the group terminated because of the RIF are "unworthy of credence." First, Smith argues that the explanation given for the RIF – that the number of claims was projected to decrease in 2004 – is not believable because the number of claims that year actually increased over the number in 2003. Smith offered exhibits in this vein that were interpreted by her counsel to show that claims increased, but Allstate submitted evidence that Smith's interpretation of those exhibits was incorrect and that the number of claims actually decreased by 26,163. There is a factual dispute on this question, but not a material one: Smith produced no evidence that the RIF was not necessary – or that Allstate knew it was unnecessary – based on the predictions made, regardless of whether those

11

predictions later proved to be correct. *See Gatch v. Milacron, Inc.*, 111 F. App'x 785, 791 (6th Cir. 2004) (even if it is shown that a RIF was not a business necessity, it does not show that the RIF was a pretext for age discrimination); *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 314-15 (6th Cir. 2001) ("It is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized . . . . [Plaintiff] must provide evidence not that [Defendant] could have made a business decision that others might think more fair, but that [Defendant] made the decision to terminate him because of his membership in a protected class."); *Graves v. Fleetguard, Inc.*, 198 F.3d 245, 1999 WL 993963, at *3 (6th Cir. Oct. 21, 1999) (Table) ("[T]he ADEA was not intended as a vehicle for judicial review of business decisions.") (quoting *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982) (internal quotation marks omitted)).

Second, although Smith does not dispute that her PDS rating was well below the number required to escape the RIF, and it is clear that Smith had had difficulties for over twenty years in the same areas that caused her to have such a low score in 2003, Smith argues that the system that Allstate uses to evaluate its employees does not accurately do so. Smith asserts that "it is mathematically impossible to accurately assess the work performance of an employee within Allstate . . . because not enough of [Smith's] work was reviewed to establish the numbers that Allstate was claiming constituted RI performance." Therefore, she argues, she should not have been in the group subjected to the RIF. But the fact that the evaluation system used may not have been the best tool for evaluating employee performance does not show that the RIF based on evaluations made under that system was not proper, *see McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (stating that a plaintiff does not create a genuine issue of material fact regarding her work

performance simply by taking issue with her supervisors' judgment); it is undisputed that all adjusters were subjected to the same evaluation system; and the record contains no evidence that the evaluation system was in itself discriminatory.[5] *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000) (an allegation of an inaccurate ratings system "does little to help [Plaintiff] establish that [Defendant] used a subjective system in order to discriminate against older employees"); *El-Marazki v. Univ. of Wisc. Sys. Bd. of Regents*, 134 F.3d 374, 1998 WL 23690, at *5-6 (7th Cir. 1998) (Table) (fact that the flawed system applied to all employees and the flaw did not align with any particular employee characteristic did nothing to lend an inference that the system was applied in a discriminatory manner). Under Smith's theory, <u>no</u> employee could have been terminated under the RIF on the basis of his or her performance evaluation.

We find no error in the district court's conclusions that Smith failed to establish a prima facie case of disparate treatment under either Title VII or the ADEA, and that, even if she had established a prima facie case, she wholly failed to present evidence from which a finder of fact could conclude that Allstate's articulated reason for terminating her employment was pretextual. We therefore affirm the district court's judgment on Smith's claims of disparate treatment under Title VII and the ADEA.

**B. Disparate Impact**

Smith also brought Title VII and ADEA claims for disparate impact on the basis of sex, race, and age.[6] *See* 42 U.S.C. § 2000e-2(k); 29 U.S.C. § 623(a). After carefully reviewing the record, the

---

[5]Notably, Smith does not believe that Denny or any of her previous supervisors who rated her work for the PDS and otherwise provided feedback had any gender, race, or age animus against her.

[6]We note that the Supreme Court determined last term that the ADEA allows for disparate impact claims, although "the scope of disparate-impact liability under ADEA is narrower than under Title VII" because the ADEA contains a "reasonable factors other than age" defense and – not having been amended by the Civil Rights Act of

13

applicable law, and the parties' briefs (counsel having waived oral argument), we are convinced that the district court did not err in its conclusion that the RIF served Allstate's legitimate employment goals. Because Smith has not attempted to show that an alternative practice would have accomplished those goals without any disparate impact, we need not discuss whether she has made out a prima facie case of disparate impact discrimination. *See Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005). As the district court's opinion carefully and correctly sets out the law governing this issue, and clearly articulates the reasons underlying its decision, issuance of a full written opinion on this issue would serve no useful purpose.

For the reasons stated in the opinion, we affirm the district court's judgment on the disparate impact claims.[7]

### IV. Title VII and FLSA Retaliation Claims

Finally, Smith asserts that the district court erred in its conclusion that she did not make out a prima facie case of retaliatory discharge sufficient to survive summary judgment, and that even if she did make out a prima facie case, her pretext arguments failed for the same reasons that they did on the Title VII and ADEA discrimination claims. Because we have concluded that Smith's allegations of pretext were insufficient to assail the RIF as Allstate's legitimate nondiscriminatory reason for Smith's discharge, we agree with the district court that summary judgment in favor of

---

1991 as was Title VII – follows the evidentiary requirements of *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 240 (2005).

[7]Smith also brought disparate impact claims under Title VII and the ADEA against Meckert as her supervisor, but those claims fail by virtue of the fact that Meckert is only her supervisor and not her "employer." *See Wathen v. General Elec. Co.*, 115 F.3d 400, 404-405 (6th Cir. 1997).

Defendants is appropriate on her retaliatory discharge claims as well.[8]

## V.  Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[8]Smith also brought retaliatory discharge claims under Title VII and the FLSA against Meckert as an individual.  Because there is simply no evidence sufficient to support a finding of pretext, and because this circuit's law is clear that Title VII claims may be brought only against the employer, the Title VII retaliatory discharge claim is without merit.  The law is not as clear regarding an FLSA claim, as the FLSA provides that "it shall be unlawful for any *person* . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3) (emphasis added).  However, Smith has wholly failed to produce evidence that Meckert had any say in which employees would be selected for the RIF or in the criteria to be used to determine which employees would be so affected, and, as with the other claims, she has produced no evidence that the RIF was pretextual. Accordingly, her claim of FLSA retaliation against Meckert is also meritless.