**NOT RECOMMENDED FOR PUBLICATION**
File Name: 10a0063n.06

**No. 09-1145**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Feb 01, 2010**
LEONARD GREEN, Clerk

| | |
|---|---|
| SUSAN CUTCHER, | ) |
| | ) ON APPEAL FROM THE UNITED |
| Plaintiff-Appellant, | ) STATES DISTRICT COURT FOR |
| | ) THE EASTERN DISTRICT OF |
| v. | ) MICHIGAN |
| | ) |
| | ) |
| KMART CORPORATION, a Michigan corporation, | ) |
| | ) |
| Defendant-Appellee. | ) |

Before:  SILER, ROGERS, and McKEAGUE, Circuit Judges.

**SILER**, Circuit Judge.  Susan Cutcher appeals the district court's grant of summary judgment in favor of Kmart Corporation ("Kmart"), based on her allegations that Kmart interfered with her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, and retaliated against her for taking FMLA leave.  For the following reasons, we **REVERSE**.

**I.  BACKGROUND**

Cutcher began working at the Port Huron, Michigan Kmart store in 1984 as a part-time employee.  Although she was briefly terminated during a workforce reduction, she was rehired and subsequently given a position as a full-time hourly associate ("FTHA").  From the year 2000 until Cutcher's termination, her direct supervisor was Barbara Borrell.  Borrell's supervisor was Lynda Moore, the store's Co-Coach.  The store's manager, whom Kmart referred to as the store Coach, was Kent Zimmerman.  Zimmerman reported to the District Coach, Henry Rodd.

No. 09-1145
*Cutcher v. Kmart Corp.*

Kmart conducted annual appraisals of each employee around the anniversary date of his or her hire. Borrell was responsible for completing annual performance appraisals of Cutcher. In her 2001-2002 appraisal, Cutcher received an overall performance rating of "exceptional," the second-highest rating. She received a score of 85 out of 100 in the areas of customer service and ongoing job accountabilities, and 88 out of 100 in the category of teamwork and personal competencies. Some of Borrell's comments noted that Cutcher "does very well in" the customer service category, "provides excellent customer service," and "is courteous and interacts well." In 2002-2003, Cutcher again received an "exceptional," which was the highest-possible rating in that year's appraisal. This reflected an overall score of 21 out of 22. She received fours—the highest score possible—in customer service, teamwork, and demonstrates work habits, and a three in effectiveness in position. Borrell noted that Cutcher "treats our customers well. She is friendly and knowledgeable," but stated that she "needs to work on her bins." In 2003-2004, Cutcher's rating dropped from "exceptional" to "exceeds expectations"—the second-highest rating possible—with a total numerical score of 20 out of 22. She again received fours in customer service and demonstrated work habits, but received threes in teamwork and effectiveness in position. Borrell noted that Cutcher "is able to provide adequate customer care" and "works hard." However, Borrell observed that "[i]t takes [Cutcher] longer to . . . accept the newer associates." Borrell completed and signed Cutcher's final annual performance evaluation before her termination on November 15, 2005. Although she still received an overall rating of "exceeds expectations," her total ratings score dropped to 18 out of 22. Her score in the teamwork category dropped from three to two, but she continued to receive fours in customer service and demonstrated work habits. Borrell's comments reflected that "Susan usually is able to

provide good, friendly customer service," her work is "usually very well done—and accurate." She also noted that Cutcher "needs to try and help train new hires. Also be supportive of all the part-timers."

In late October or early November 2005, Cutcher learned that she needed to undergo surgery. She informed Cathy Sheldon, the Port Huron Store Human Resources Coach, that she intended to take a leave of absence ("LOA") and submitted the necessary forms to Sheldon in early November 2005. Her doctor signed the forms and indicated she would need six weeks off work after surgery. Sheldon also gave Cutcher the phone number for MetLife, Kmart's short-term-disability ("STD") leave insurer. Cutcher contacted MetLife and completed its claim documents. MetLife approved her STD claim, and Cutcher commenced a paid STD leave effective December 5, 2005. This leave also qualified as an authorized FMLA leave. Although Cutcher informed Borrell that she was taking a leave for medical purposes, she never discussed her leave with any of the other supervisors. Zimmerman knew that she was on some sort of medical leave, but believed it was STD leave, not FMLA leave. As evidence of that belief, he demonstrated that he never signed her FMLA notice.

On December 21, 2005, while Cutcher was on leave, Kmart announced a nation-wide reduction in force ("RIF"). The Workforce Adjustment Guidelines ("Guidelines") provided instructions to each store for determining how many FTHA layoffs they would need to conduct. The Guidelines explained that the RIF would help to "ensure that [Kmart has] the correct mix of full-time and part-time hourly associates." As reflected in the Guidelines, the maximum number of FTHAs was to be determined based on the store's sales volumes. The Port Huron store's maximum number of FTHAs was 45. At the time, it had 51 FTHAs. Accordingly, it was required to reduce the number

of FTHAs by six. However, the Guidelines identified the Port Huron store as "having special staffing needs." Thus, it was "approved for additional full-time positions above and beyond the volume group chart and select position specifications outlined." Nonetheless, the Port Huron store terminated six FTHAs. The Guidelines provided specific steps for determining how many and which associates would be impacted. After identifying the number of FTHAs impacted, the Guidelines instructed the stores to complete the Associate Performance Recap Form for each FTHA.

The Associate Performance Recap Form included the same four performance-indicator categories as the annual evaluations: customer service, teamwork, demonstrated work habits, and effectiveness in position. The form also considered the employee's most recent annual appraisal rating in calculating each employee's total average score. The instructions on the form required the stores to provide an explanation in the comments section or with additional documentation if there was a significant change in an employee's score when compared to their annual appraisals. "A reduced score in two or more categories without documented explanation is unacceptable." The Guidelines included the following instructions for completing these forms: "When rating each associate ensure that your analysis is based on observed, objective job-related performance." The Guidelines also stated that "[t]hose on a leave of absence . . . are to be included in the selection process, but the fact of their LOA . . . is not to be considered as a rating factor," and instructed the stores that any LOA associate selected for termination should not be terminated until he or she returned to active status.

Zimmerman sought the assistance of the store's Co-Coaches in rating the store's employees. For Cutcher's department, Zimmerman met with Moore and Borrell to conduct the RIF appraisals.

Cutcher received a rating of two in customer service, one in teamwork, four in work habits, and three in effectiveness in position. Her 2005 appraisal score of eighteen was converted to a three, as instructed by the Associate Performance Recap Form. Cutcher's total average RIF appraisal score was 2.6. Zimmerman and Borrell both testified in their depositions that Cutcher's leave status was not considered in completing her Associate Performance Recap Form or calculating the rankings. Nonetheless, the following comment was in the comment section next to Cutcher's name: "Poor customer and associate relations. LOA." Zimmerman and Moore both testified that the comments section was to be used to explain the reasons for scoring lower than the most recent annual appraisal. Moore claims that she did not know Cutcher was on leave at the time of the meeting, and Kmart asserts that her status was never mentioned at the meeting. Although Moore and Borrell influenced the content of the comments, it appears that Zimmerman selected the exact text. Zimmerman testified that the inclusion of "LOA" was meant to note that Cutcher was on a leave of absence, and thus to be terminated at a different time than the other impacted associates.

Once the ratings for all of the store's FTHAs were completed, the FTHAs' scores were averaged according to the Guidelines, and the associates were ranked in order from lowest (51) to highest (1). The associates ranked 46-51 were those who would be impacted by the RIF. This included Cutcher, whose ranking was 47. However, if her evaluation had been identical to her November 15, 2005, evaluation, her ranking would have been high enough to avoid the RIF. On the Impacted Associates Form, next to Cutcher's name, Zimmerman indicated that she was "[o]n LOA at present time, will term when she returns." Rodd approved the selections. In accordance with the Guidelines, Cutcher was not terminated until she returned to active status on January 23, 2006.

Cutcher emphasizes that only twenty days passed between the issuance of her "exceeds expectations" 2004-2005 annual appraisal and her RIF appraisal. Borrell, Moore, and Zimmerman admitted that they did not know of any disciplinary problems with Cutcher during that twenty-day period. However, Borrell testified that she often scored associates higher on annual appraisals than they deserved, because she did not like confrontation. She also testified to examples that supported Cutcher's lower scores. For instance, she stated that Cutcher did not treat customers courteously, did not want to run the registers when asked, did not make eye contact and speak to customers, did not handle returns well, did not work well with other associates, made inappropriate comments about other associates, had difficulty accepting decisions made by management, and that other associates asked not to work with her. Despite these issues, Cutcher never received a single written or verbal reprimand and was never disciplined. Moreover, in each annual appraisal, she was rated as "exceptional" or "exceeds expectations." Zimmerman was notified that some associates thought she was rude, but he was not notified about any other concerns.

Cutcher's position itself was not eliminated during the RIF. Rather, it was given to a co-worker who received a higher RIF appraisal ranking and was not terminated. Her replacement had never taken FMLA leave, though she had taken another form of a medical leave.

Cutcher filed a complaint against Kmart in January 2004, alleging that Kmart violated the FMLA by interfering with her FMLA leave and retaliating against her for taking FMLA leave. Kmart moved for summary judgment under Federal Rule of Civil Procedure 56(c). The district court granted Kmart's motion. *Cutcher v. Kmart Corp.*, No. 2:08-cv-10060, 2009 WL 36488, at *11 (E.D. Mich. Jan. 6, 2009). Cutcher timely appeals.

## II. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, we construe all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

## III. DISCUSSION

Under the FMLA, an "eligible" employee may take up to twelve weeks of unpaid leave in certain situations, including for a serious medical condition. 29 U.S.C. § 2612(a)(1). Employers may not "interfere with, restrain or deny the exercise of or attempt to exercise, any [FMLA] right provided." *Id.* § 2615(a)(1). Thus, "any eligible employee who takes [FMLA] leave . . . shall be entitled, on return from such leave– to be restored by the employer to the position of employment held by the employee when the leave commenced; or to be restored to an equivalent position . . . ." *Id.* § 2614(a)(1). Similarly, an employer may not retaliate against an employee for invoking her right to FMLA leave. *Id.* § 2615(a)(2); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

## A. Interference

Cutcher alleged that Kmart interfered with her rights under the FMLA when it terminated her upon her return to work after taking FMLA leave. To prevail on an interference claim, she must prove that: (1) she was an eligible employee; (2) Kmart was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave Kmart notice of her intention to take leave; and (5) Kmart denied her FMLA benefits to which she was entitled. *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008). The parties do not dispute the first four elements; rather, their dispute rests on whether Kmart denied Cutcher FMLA benefits to which she was entitled.

Under § 2614(a)(3)(B), "[a]n employee returning from FMLA leave is not entitled to restoration unless [s]he would have continued to be employed if [s]he had not taken FMLA leave." *Hoge v. Honda of Am.*, 384 F.3d 238, 245 (6th Cir. 2004). Thus, "an employer need not restore an employee who would have lost his job or been laid off even if he had not taken FMLA leave." *Id.* Kmart argues, and the district court agreed, that it would have fired Cutcher even if she had not taken FMLA leave. Cutcher, on the other hand, argues that Kmart's post-hoc rationalization of her lower RIF appraisal score, in light of the fact that there had been no prior documented complaints against her and that "LOA" was written in the comment section of the Associate Performance Recap Form, creates a question for the jury as to whether she would have been fired had she not taken FMLA leave. In response, Kmart argues that "LOA" was written next to Cutcher's name in the comment section of the Associate Performance Recap Form as a reminder that her termination procedures were different than the other impacted associates. Construing the facts in the light most favorable to Cutcher, as we must, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, there is a disputed material fact

as to whether "LOA" was listed as a reason for Cutcher's lower score. Both parties agree that the comment section was meant to identify the reason(s) for a RIF appraisal score that was significantly lower than an impacted employee's most recent annual appraisal score. Although Kmart contends that there is no evidence showing that it was prohibited from including additional information in that section, it has not pointed to evidence that it was meant to be used for another purpose. Because a reasonable juror *could* believe Cutcher's theory—that the "LOA" notation was listed as a reason for her lower appraisal scores, and thus her termination—summary judgment was inappropriate.

The jury could also conclude that Cutcher's termination was based on her FMLA leave, because none of Kmart's asserted reasons for her lower RIF appraisal scores were documented, and Kmart admitted that nothing in her performance changed during the twenty-day period between her last annual appraisal and the RIF appraisal. Although Kmart contends that variations between annual appraisal scores and the RIF appraisal scores were common, that Borrell inflated the annual appraisal scores, and that Cutcher's performance had been declining, a reasonable jury could reject Kmart's contentions. Given Cutcher's prior annual appraisal scores, the minimal amount of time that passed between her most recent annual appraisal and the RIF appraisal, Kmart's admission that Cutcher's performance did not change during that short period of time, the inclusion of the "LOA" notation on the Associate Performance Recap Form, and the lack of any documented evidence demonstrating a prior concern with her job performance, a jury could infer that her leave status impacted her RIF appraisal ratings, thus leading to her termination.

No. 09-1145
*Cutcher v. Kmart Corp.*

**B. Retaliation**

Absent direct evidence of retaliation, we apply the *McDonnell Douglas* burden-shifting test to Cutcher's claim. *Bryson*, 498 F.3d at 570. To establish a prima facie case of retaliation, Cutcher must first demonstrate that: (1) she was engaged in an activity protected by the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between her protected FMLA activity and the adverse employment action. *Id.* If Cutcher makes a prima facie showing, the burden shifts to Kmart to demonstrate evidence of a legitimate, non-discriminatory reason for the adverse employment action. *See Bryson*, 498 F.3d at 570. If Kmart satisfies this burden of production, the burden shifts back to Cutcher to show Kmart's proffered reason is pretext for unlawful discrimination. *See id.*

Kmart argues that Cutcher failed to demonstrate a prima facie case of retaliation, because she did not produce evidence of a causal connection between her FMLA leave and her termination. The district court agreed. *Cutcher*, 2009 WL 36488, at *10. However, as the district court recognized, "'[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there [was] a causal connection between the retaliatory action and the protected activity.'" *Id.* at *9 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Although temporal proximity alone is insufficient to establish circumstantial evidence of a causal connection, "temporal proximity between the protected activity and the adverse employment action, 'coupled with other indicia of retaliatory conduct,' may give rise to a finding of causal connection." *Dixon*, 481 F.3d at 333 (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006)).

The district court recognized that Cutcher demonstrated a temporal proximity, but concluded that there were no other indicia of retaliatory conduct. *Cutcher*, 2009 WL 36488, at *10. The court weighed the evidence and rejected the importance of the "LOA" notation and the discrepancy between her RIF appraisal score and her prior annual appraisal scores. *Id.* For the reasons discussed above, however, that evidence created a factual question as to whether Cutcher's FMLA leave led to her lower RIF appraisal scores, and thus her termination.[1] *Cf. Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003) (affirming district court's denial of a renewed motion for judgment as a matter of law in favor of the defendant employer where causal connection was based only on temporal proximity, evidence of prior performance appraisals in which the plaintiff "[met] expectations in all areas," and demeanor of witnesses). Cutcher met her prima facie burden, and the burden now shifts to Kmart to produce evidence that it had a legitimate, non-discriminatory basis for terminating Cutcher. *Bryson*, 498 F.3d at 570. Kmart has met its burden of production by demonstrating evidence of a nation-wide RIF, which could be a legitimate, non-discriminatory basis for terminating Cutcher.

Cutcher now must show that Kmart's reasons for terminating her were pretextual. At this stage, "we consider whether [Cutcher] has adduced evidence which would enable a factfinder to

---

[1]Kmart emphasizes the fact that Moore may not have known at the time the RIF appraisal was conducted that Cutcher was on leave and that Zimmerman believed she was on STD leave rather than FMLA leave to support its argument that Cutcher cannot demonstrate a causal connection. The evidence demonstrates, however, that Borrell knew Cutcher was on medical leave and that Borrell was at least partly responsible for rating Cutcher. Even if Zimmerman and Moore did not know Cutcher was on medical leave, Borrell's knowledge is sufficient for a jury to conclude that her leave, in part, caused her lower RIF appraisal rating and thus her termination.

conclude that [Kmart's] stated reason for terminating her is not the true reason and is simply pretext for unlawful retaliation." *Bryson*, 498 F.3d at 572. A plaintiff may satisfy this burden "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).

Cutcher first argues that Kmart's proffered reason is pretextual because the Guidelines indicated that the Port Huron store had special staffing needs, and thus did not actually have to terminate six employees. Nonetheless, the undisputed evidence shows that Zimmerman followed the RIF procedures in rating all of the store's FTHAs and ultimately terminating six employees. Although the Guidelines create some confusion as to the basis of Zimmerman's conclusion that the store had to terminate six employees, Cutcher's assertion that the RIF did not apply to the Port Huron store is speculative and, alone, insufficient for showing pretext.

Cutcher also argues—and the jury could conclude—that the same circumstantial evidence supporting the causal connection between her FMLA leave and her termination demonstrates that Kmart's proffered non-discriminatory reason was pretextual. Specifically, the following facts could show pretext: the temporal proximity between her leave and termination; the lack of documentation to corroborate her lower RIF appraisal scores; the lack of temporal proximity between the events that Kmart alleges justified her lower RIF appraisal scores and her termination; her documented favorable work history; the discrepancy between her prior annual appraisals and her RIF appraisal, and the "LOA" notation next to Cutcher's name on the Impacted Associates Form.

The district court rejected these proffered reasons, but Cutcher has produced sufficient evidence—listed above—from which a jury could conclude that Kmart used the RIF as a means of terminating her. Because this additional evidence creates a material question of fact as to Kmart's intentions, this case is distinguishable from other cases in which plaintiffs have not been able to demonstrate pretext. For example, the plaintiff in *Smith v. Allstate Ins. Co.*, 195 F. App'x 389 (6th Cir. 2006), did not demonstrate pretext because she simply argued that the method for evaluating employees was flawed and that the reduction itself was unnecessary. *Id.* at 395-96. Additionally, we explained that it was "clear that [she] had difficulties for over twenty years in the same areas that caused her to have such a low score" in the performance appraisal at the time of the reduction. *Id.* at 396. Here, however, Cutcher is not arguing that the procedures for evaluations themselves were flawed, but that Borrell rated her lower based on her FMLA leave status. Although she has not presented direct evidence to support that argument, the circumstantial evidence creates a question of material fact for the jury. Because both parties' theories regarding the importance of these facts are legitimate, there is a question of fact for the jury.

## IV. CONCLUSION

For the reasons stated above, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.