RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0328p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KAREN BRYSON,

*Plaintiff-Appellant,*

v.

No. 06-5137

REGIS CORP.; MINNESOTA REGIS CORP.; BORICS;
REGIS HAIRSTYLISTS; SUPERCUTS CORP. SHOPS,
INC.; SUPERCUTS; SUPERCUTS OF DELAWARE, INC.,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 04-00516—Karl S. Forester, District Judge.

Submitted: July 25, 2007

Decided and Filed: August 16, 2007

Before: KEITH, MOORE, and COLE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Leslie Dean, LESLIE DEAN, ATTORNEY, Lexington, Kentucky, for Appellant.
Mauritia G. Kamer, STITES & HARBISON, Lexington, Kentucky, for Appellees.

_____

## OPINION

_____

R. GUY COLE, JR., Circuit Judge. Plaintiff-Appellant Karen Bryson appeals the grant of
summary judgment to Defendant-Appellee Regis Corporation[1] on Bryson's claims of (1) retaliation
in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*;
(2) retaliation in violation of the Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. § 344.010
*et seq.*; and (3) disability discrimination in violation of the KCRA, Ky. Rev. Stat. § 344.0101 *et seq.*
Bryson also appeals the district court's denial of her motion for partial summary judgment on her
disability-discrimination claim.

---

[1]In addition to Regis Corporation, the other named Defendants are Minnesota Regis Corporation, Borics, Regis
Hairstylists, Supercuts Corporation Shops, Inc., Supercuts, and Supercuts of Delaware. For the sake of simplicity, we
refer to the Defendants collectively as "Regis."

1

For the reasons set forth below, we **REVERSE** the district court's grant of summary judgment on Bryson's FMLA-retaliation and disability-retaliation claims and **REMAND** for further proceedings. We **AFFIRM** the district court's grant of summary judgment to Regis on Bryson's disability-discrimination claim and **AFFIRM** the district court's denial of Bryson's motion for partial summary judgment.

# I. BACKGROUND

## A. Facts

Karen Bryson worked at a Supercuts store in Lexington, Kentucky for fifteen years. She started out as a hairstylist but was quickly promoted to shift manager and then store manager. As a store manager, Bryson spent approximately ninety percent of her time cutting hair. Her duties also included hiring and firing, employee training and supervision, and managerial paperwork, such as assigning work schedules and keeping track of the store's performance statistics. Bryson's immediate supervisor was Kim Sawyer, a Supercuts "area manager." Bryson and Sawyer talked each week to discuss the store's operations and Bryson's responsibilities.

In approximately October or November 2002, Bryson injured her left knee while cleaning out her closet at home. She went to see a doctor the following day and was instructed only to keep her leg elevated. Over the next several months, Bryson's knee improved and she did not seek additional medical attention. In August 2003, however, she saw her family physician, Dr. Michael Eden, complaining of pain and swelling in the knee. Dr. Eden took x-rays, but these were inconclusive, so he referred her to Dr. Peter Hester, an orthopedic surgeon.

Dr. Hester recommended that Bryson undergo physical therapy to strengthen the muscles around her knee. Bryson complied. She attended physical-therapy sessions twice a week beginning in September 2003, but by mid-October, she and her therapist decided to end the sessions pending further consultation with Dr. Hester because her knee condition was worsening and the physical therapy seemed only to be exacerbating it.

At the beginning of November 2003, Bryson underwent an MRI test, which showed a growth in her knee. Dr. Hester gave her a cortisone injection to reduce the swelling, but there was no improvement. On December 3, the swelling in her knee still not having abated, Dr. Hester advised Bryson that she would need to have surgery. The surgery was scheduled for December 16, and Dr. Hester's surgical nurse told Bryson that, provided everything went according to plan, she would be able to return to work within two weeks.

Bryson kept Sawyer advised about her knee condition and what she was doing to treat it throughout the fall of 2003. On December 6, 2003, she informed Sawyer in a voice mail that she needed to have corrective surgery on her knee and that her doctor had scheduled the surgery for December 16. Bryson testified that Sawyer reacted unfavorably to this news, telling Bryson that she could not take the time off because the store was too busy. Bryson then contacted Dr. Hester's office to find out if she could delay her surgery. Dr. Hester's surgical nurse told her that she could not.

When Bryson relayed to Sawyer her doctor's opposition to a postponement, Sawyer told Bryson that her absence would hurt the store and that she was behaving selfishly. Based on her conversations with Sawyer, Bryson was left with the impression that Sawyer was going to fire her for taking any time off to deal with her knee, although Bryson admitted that Sawyer never explicitly threatened her with termination. Bryson testified that beginning on December 8, when Sawyer first responded to Bryson's voice mail about her scheduled surgery, through December 15, Sawyer retaliated against her by calling her everyday to yell at her; by telling her that she (Sawyer) had spoken with the lawyers at Supercuts who told her that she could deny Bryson's leave request; by

forcing Bryson to work on a day that she was scheduled to be off; and by requiring Bryson to work from opening to closing without any breaks the day before her scheduled surgery.

Other Supercuts employees corroborated Bryson's testimony about Sawyer's negative reaction to Bryson's request for medical leave. Roni Richardson, a shift manager at the Lexington store, testified that Sawyer "was quite upset and said [Bryson] uh, 'made' it happen at Christmastime, that she could have had this surgery at another time . . . ." (Joint Appendix ("JA") 953.) Further, Richardson testified that Sawyer "informed me that uh, she [Bryson] would not be able to keep her job when she came back, she'd make sure of it . . . ." (JA 953.) Another Supercuts employee, Donna Hundley, testified that she heard Sawyer refer to Bryson as a "crippled ass" while they were driving to an off-site managers' meeting on January 6, 2004, and that Sawyer said that Bryson "won't be at another meeting." (JA 960-61.) At an office party on January 10, 2004, Hundley testified that Sawyer made wisecracks about Bryson not really being injured.

Sawyer disputed that she was angry about Bryson's request for leave but admitted that the timing was inconvenient because it fell during the Christmas holiday: "Well any time during a busy season, it's really hard, and with the store being short-staffed, I don't think I was like upset because if she needed to have the surgery that was fine." (JA 986.)

In the end, Sawyer's hostility did not deter Bryson from requesting FMLA leave. She completed the necessary paperwork and faxed it to Sawyer on December 15, 2003, who forwarded it on to Regis's corporate headquarters. Bryson requested leave for the period of December 16, 2003 through January 1, 2004. On January 9, 2004, Regis formally approved Bryson's request in its "Employer Response To FMLA Request" ("Employer Response"). (JA 212-15.) Although Regis confirmed that Bryson was eligible for FMLA leave, it gave her the option of substituting her paid vacation time for unpaid FMLA leave, which Bryson elected to do. The Employer Response therefore noted that her leave would not be counted against her annual FMLA allotment of twelve weeks and further set her return-to-work date as January 1, 2004.

During Bryson's surgery, Dr. Hester repaired a torn meniscus in her knee and torn cartilage. Bryson's leg was immobilized in a brace for about four weeks following the surgery and she had to use a wheelchair.

At a check-up on December 23, Dr. Hester told Bryson that she would not be able to return to work as expected on January 1. Bryson therefore filed paperwork with Regis in December requesting an extension of her medical leave. In a letter dated February 13, 2004, Regis granted her request, stating:

> We are able to extend your leave. Please be advised that FMLA provides up to 12 workweeks of a job-protected leave. *You are expected to return to work no later than March 10, 2004.* This will exhaust your 12 workweek entitlement to Family and Medical Leave.

(JA 166.)[2]

---

[2] Bryson does not allege that Regis denied her the full twelve weeks of FMLA leave to which she was entitled under the statute. The record suggests that perhaps she should have. As described above, Bryson chose to use her paid vacation time for the first two weeks of her leave, covering the period of December 16 through December 31. Regis's Employer Response Form specifically stated that Bryson's paid-vacation leave would not be deducted from her twelve weeks of annual FMLA leave. Thus, the clock on her unpaid, FMLA leave did not start ticking until January 1, 2004. Assuming this commencement date, Bryson's FMLA leave did not run out until March 24, 2005. Regis calculated Bryson's leave as expiring on March 9, 2004, thereby depriving her of fifteen days of leave. It appears as though Regis made this counting error by including Bryson's paid-vacation leave in its calculations.

Consistent with Regis's FMLA policy, Bryson's treating physician, Dr. Hester, completed two Regis-created forms entitled "Certification of Healthcare Provider" ("Certification") in January and February 2004. On both Certifications, Dr. Hester stated that Bryson could "perform seated work." (JA 218-20.) On March 8, 2004, two days before Bryson's scheduled return to work, Bryson and Dr. Hester completed a Regis form entitled "Release/Intent To Return To Work" ("Release Form") that Regis required employees on FMLA leave to submit prior to coming back on the job. In the section of the Release Form to be completed by the Regis employee, Bryson checked the option stating, "I am currently unable to fully perform all functions of my present position and am requesting assistance with temporary restrictions, as designated below." (JA 243.) Bryson then wrote in, referring to the physician portion of the Release Form: "see next page—doctors [sic] orders—can do seated work only." (JA 243.) Bryson testified that when she included this information on the Release Form, she was relying on her conversations with Dr. Hester, in which he told her that she could perform seated work.

In the physician section of the Release Form, Regis provided a job description for the position of "hairstylist," which it asked the physician to review. The job description specifically enumerated the duties of a "hairstylist," which included such tasks as "[c]ontinuous standing" and "[c]ontinuous walking." (JA 244.) Below the option stating, "The employee is released to return to work on _____ (date), but with the following restrictions," Dr. Hester wrote, "Pt. [patient] unable to return to work at this time to required work responsibilities." (JA 244.) Dr. Hester did not mention any "restrictions" and did not say anything about Bryson being able to perform seated work, although he had previously noted that she could do seated work in the Certifications he filled out in January and February. In response to the question, "How long will the employee likely be under these restrictions," Dr. Hester responded, "[u]nknown."

The date stamp on the Release Form shows that Regis received it on March 15, 2004. In a letter dated five days earlier, on March 10, 2004, Regis terminated Bryson on the grounds that her physician had not cleared her to return to work. The author of the letter was Regis FMLA Administrator Melissa Brooker Zollman. The letter stated:

> It has been brought to my attention that as of today your health care provider has not released you to return to work with or without restrictions. Because you have exhausted your 12 workweek entitlement to job protected leave under the FMLA, we are unable to continue to hold your position.

(JA 246.) The letter concluded by inviting Bryson to reapply for employment with Supercuts when she had been fully released by her physician.

Bryson testified that in addition to mailing the Release Form to Regis on March 8, 2004, she left Sawyer a voice message on the same day about the status of her health.[3] Bryson did not testify about the content of that voice mail. Because she had not heard back from Sawyer, the following day (March 9), Bryson called Julie Wilson, a senior manager who worked closely with Sawyer. Bryson testified that she "wanted to call Julie and tell her that I can work some standing as well as some sitting, I just couldn't work full-time standing. Um, but I could do seated work part of the time as well as standing part of the time." (JA 905.) Bryson further testified that in March 2004, she was able to stand for fifteen to twenty minutes at a time with three to four minutes of sitting in between. She stated that, "I was able to stand, it's just not, not for 10 hours at a time." (JA 905.) According

---

[3]Bryson testified that when her knee condition worsened in August 2003, she began to maintain a contemporaneous log of all her medical appointments, in addition to her communications with Sawyer and other Regis personnel about her condition. For March 8, 2004, Bryson's log reads in part: "Left message with Area Supervisor [Sawyer] on status. Mailed required forms to Supercuts Corporation. Never heard from Area Supervisor." (JA 463.)

to Bryson, Wilson told her that "she didn't think that corporate or Kim [Sawyer] would go for that," referring to Bryson's proposal to perform seated work and help train new managers.[4]  (JA 906.)

Bryson received Regis's termination letter on March 11, 2004.  She left voice messages with both the author of the letter, Brooker Zollman, and Monty Payne, who was carbon-copied on the termination letter and described as "director."  (JA 246.)  Neither returned her calls.  Bryson tried calling again on March 15, but again was not able to speak directly with either Brooker Zollman or Payne.

Four months after her surgery, Bryson complained of pain and lack of mobility in her knee. Dr. Hester diagnosed her as having "complex regional pain syndrome," also known as "reflex sympathetic dystrophy" ("RSD").  Another doctor, Dr. Paul Brooks, a physical medicine/rehabilitation specialist, to whom Dr. Hester referred Bryson, confirmed this diagnosis and began Bryson on a course of treatment.  At her deposition, Bryson described RSD as a condition that causes the sympathetic nervous system to go into "overdrive" and in so doing, causes extreme pain. (JA 910-11.)  Dr. Hester testified that the onset of RSD complicated Bryson's recovery from her knee surgery and "develops into quite a debilitating condition for these folks" (presumably referring to RSD patients). (JA 183.)  Nonetheless, Dr. Hester testified that by January 2005, Bryson's RSD had been brought under control and that she did not have any restrictions on her ability to work as of that time.  (JA 183-84, 186 (Dr. Hester stating in a letter to Bryson's counsel that "[a]s of January 18, 2005 it was felt that [Bryson's] knee had improved considerably and was well resolved").)

In September 2004, Bryson enrolled as a full-time student at Sullivan College, with the goal of becoming a paralegal.

## B.  Procedural History

Bryson filed suit in Kentucky state court on October 21, 2004.  Regis timely removed the case to federal court.  In her amended complaint, Bryson asserted five claims for relief, including (1) retaliation in violation of the FMLA, 29 U.S.C. § 2601 *et seq.*; (2) retaliation in violation of the KCRA, Ky. Rev. Stat. § 344.010 *et seq.*; (3) disability discrimination in violation of the KCRA, Ky. Rev. Stat. § 344.0101 *et seq.*; (4) wrongful discharge under Kentucky law; and (5) intentional infliction of emotional distress under Kentucky law.

On September 15, 2005, Regis moved for summary judgment on all of Bryson's claims.  On the same date, Bryson moved for partial summary judgment on her claim for disability discrimination under the KCRA.  The district court granted Regis's motion in full on December 20, 2005, denied Bryson's motion, and dismissed Bryson's case.

The district court first concluded that Bryson had not established a prima facie case of retaliation in violation of the FMLA because she had not shown a causal connection between the adverse employment action—her termination from Supercuts—and her exercise of her statutory rights.  *Bryson v. Regis Corp.*, No. 04-516, slip op. at 5 (E.D. Ky. Dec. 20, 2005).  The district court stated that "[i]t is clear to the Court that [Bryson] was terminated because she could no long[er] fulfill the requirements of the position with Supercuts."  *Id.*

---

[4]Bryson's contemporaneous log describes her conversation with Wilson as follows: "Talked to Julie Wilson, Area Supervisors [sic] Assistant, about working some in mostly seated position, training new managers for the new stores opening, helping set up new stores, etc.  She did not think corporate would comply."  (JA 463.)

Next, the district court held that Bryson was not "disabled" within the meaning of the Americans with Disabilities Act ("ADA"), and that therefore her claims for retaliation on grounds of disability, disability discrimination, and wrongful discharge lacked merit.[5] *Id.*

The district court determined that Bryson was not disabled because her knee surgery and her RSD did not substantially limit her in the major life activities of standing, walking, and working. *Id.* at 6. According to the district court, "[w]hile [Bryson] is affected in her ability to work as a hairdresser, she can still stand, walk and work in other areas." *Id.* at 9. Further, the court stated that Bryson "can perform activities that are central to her life, and her physician has testified to the effect that her condition is in a controlled state. The evidence presented does not prove that the term of [Bryson's] impairment was lengthy enough to constitute a disability under the ADA or KRS [§] 344." *Id.* at 10. The district court did not address Bryson's claim for intentional infliction of emotional distress.

Bryson timely appealed the district court's judgment. Before this Court, she argues that the district court erred in granting summary judgment to Regis on her (1) FMLA-retaliation claim, and (2) her retaliation and disability-discrimination claims under the KCRA. Bryson also contends that the district court erred in refusing to grant her motion for partial summary judgment on her disability-discrimination claim. Bryson does not challenge the dismissal of her wrongful-discharge and intentional-infliction-of-emotional-distress claims.

## II. DISCUSSION

### A.      Standard of Review

We review a district court's grant of summary judgment de novo. *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* Our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### B.      Bryson's FMLA-Retaliation Claim

#### 1.      *Applicable Legal Standards*

The FMLA enables employees covered by the Act to take up to twelve weeks of leave per year for various purposes specified in the statute, including the employee's own "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). At the expiration of the employee's leave period, she must be reinstated to her position or to a position equivalent in pay, benefits, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1).

This Circuit recognizes two distinct theories of wrongdoing under the FMLA. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555-56 (6th Cir. 2006). The "entitlement" or "interference"

---

[5]Bryson did not assert a claim under the ADA. Rather, she asserted claims for retaliation and disability discrimination under the KCRA. We presume that the district court inadvertently referred to the ADA throughout its opinion because the same legal standards control the adjudication of claims brought under the KCRA, as under the ADA.

theory arises from §§ 2615(a)(1) and 2614(a)(1), which make it unlawful for employers to interfere with or deny an employee's exercise of her FMLA rights (§ 2615(a)(1)), and which require the employer to restore the employee to the same or an equivalent position upon the employee's return (§ 2614(a)(1)). *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003). The "retaliation" or "discrimination" theory, on the other hand, arises from § 2615(a)(2), which prohibits an employer from discharging or discriminating against an employee for "opposing any practice made unlawful by" the Act. *Id.*

Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). At the outset, "the plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Macy*, 484 F.3d at 364 (internal quotation marks and citation omitted). There are "various context-dependent ways by which plaintiffs *may* establish a prima facie case." *Id.* at 365; *accord Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (stating that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic'") (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). One of the ways in which we have previously held that a plaintiff may make out a prima facie case is by showing that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

If the plaintiff satisfies her prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Macy*, 484 F.3d at 364. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination. *Id.* "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (alteration in original).

### 2.     *Bryson's Prima Facie Case*

Applying the elements of the prima facie case set forth in *Skrjanc* makes sense given the facts of this case. *See, e.g., Macy*, 484 F.3d at 365 (stating, in an ADA case, that "[u]nder the facts of this case, the prima facie case formulation set forth in *Monette* [*v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)] applies quite well."). There is no dispute that the first two elements of the prima facie case are satisfied here. Bryson engaged in statutorily protected activity by taking FMLA-approved leave to undergo and recover from knee surgery. Further, Bryson suffered an adverse action because she was terminated at the conclusion of her leave period.[6] The district court concluded that Bryson failed to establish a causal connection because the record revealed that she was not terminated for exercising her statutory right to take FMLA leave, but because, according to her own doctor, she was unable to perform her job duties by March 10, 2004, her scheduled return-to-work date.

We disagree with the district court's determination. As an initial matter, "[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc*, 272 F.3d at 315; *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the prima

---

[6]Because the record shows that Bryson suffered an adverse action insofar as she was terminated from Supercuts, we do not address her contention that she suffered a second, distinct adverse action in that Sawyer subjected her to a hostile work environment between December 8, 2003, and December 15, 2003, the period between Bryson's request for leave and her last working day.

facie stage is minimal . . . .”). Here, Regis terminated Bryson on March 10, 2004, three months after Bryson requested FMLA leave, and the very day that she was scheduled to return to work. We have previously held that proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection. *Skrjanc*, 272 F.3d at 314; *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir. 2002) (stating that, in the FMLA context, “[p]roximity in time can raise a prima facie case of retaliatory discharge”).

Moreover, Bryson has presented evidence from other Regis employees, including Richardson and Hundley, who testified that Sawyer was angry about Bryson’s FMLA leave-taking, and that Sawyer stated that she would see to it that Bryson did not have a job to return to. Given this evidence and the low threshold showing that a FMLA plaintiff must make to survive the prima facie stage of proof, we conclude that Bryson has made out a prima facie case of retaliation.

### 3.       *Regis’s Non-Discriminatory Reason*

The burden now shifts to Regis to present evidence of a legitimate, non-discriminatory reason for terminating Bryson. *St. Mary’s Honor Ctr. v. Hicks*, 509 U.S. 506-07 (1993) (“‘The defendant must clearly set forth, through the introduction of admissible evidence,’ reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action.”) (quoting *Burdine*, 450 U.S. at 254-55, n.8). Regis argues that it terminated Bryson not in retaliation for exercising her right to FMLA leave, but because she was not able to return to work at the expiration of her leave period, on March 10, 2004. In support, Regis points to the Release Form filled out by Dr. Hester on March 8, 2004, in which he stated that Bryson was “unable to return to work at this time to required work responsibilities.” (JA 244.)

We have held that “an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave.” *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506-07 (6th Cir. 2006) (citing *Cehrs v. Ne. Ohio Alzheimer’s Research Ctr.*, 155 F.3d 775, 784-85 (6th Cir. 1998) and *Williams v. Toyota Motor Mfg., Ky., Inc.*, 224 F.3d 840, 845 (6th Cir. 2000), *rev’d on other grounds*, 534 U.S. 184 (2002)). The *Edgar* Court held that the employer did not violate the FMLA in terminating the plaintiff because both of the plaintiff’s treating physicians opined that she was not able to return to work until long after her FMLA leave had expired. 443 F.3d at 514; *accord Cehrs*, 155 F.3d at 785-86 (affirming the district court’s grant of summary judgment for the employer on the plaintiff’s FMLA claim because she was unable to return to work upon the expiration of her leave period); 29 C.F.R. § 825.214(b) (“If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA.”).

Accordingly, we hold that Regis has carried its burden to present evidence of a legitimate, non-discriminatory reason regarding why it terminated Bryson.

### 4.       *Pretext*

At the pretext stage, we consider whether Bryson has adduced evidence which would enable a factfinder to conclude that Regis’s stated reason for terminating her is not the true reason and is simply a pretext for unlawful retaliation. We conclude that there are genuine issues of material fact as to what information Regis relied upon in deciding to terminate Bryson, such that summary judgment is improper.

As described above, our decision in *Edgar* appears to support Regis’s termination decision. Afterall, it is uncontroverted that Dr. Hester stated on March 8 that Bryson was not medically ready to resume her job duties and that he did not know when she would be. *Edgar*, however, also held that the timing of when the employer learns about the plaintiff’s continuing impairment may be

relevant to assessing the lawfulness of the employer's termination decision. Specifically, we stated in *Edgar* that in an FMLA claim premised on an "entitlement" theory of wrongdoing, the point in time at which the employer learns of the plaintiff's inability to return to work is immaterial because "entitlement" claims do not implicate the employer's motives. "Employers in entitlement cases should thus be able to invoke *Cehrs* and 29 C.F.R. § 825.214(b) (the DOL regulation) even if the medical evidence on which they rely did not emerge until after the employment decision occurred." *Edgar*, 443 F.3d at 512.

But the situation is different when the plaintiff asserts a retaliation claim, as Bryson has done, because retaliation claims turn on the employer's motive for discharging the plaintiff. *Id.* at 508, 512 (stating that "the employer's motive is an integral part of the analysis" in retaliation claims). Thus, we stated that, "in a retaliation case, after-acquired evidence of an employee's inability to return to work cannot be used to shield a defendant from liability, but should be considered in determining the appropriate remedy for the FMLA violation." *Id.* at 513. In other words, an employer who decides to terminate an employee *before* being notified that the plaintiff is incapable of returning to work at the conclusion of her leave cannot rely on evidence regarding the plaintiff's ongoing medical condition to defeat an FMLA retaliation claim.

The record in this case reveals material factual questions regarding when Regis learned that Bryson was unable to return to work in relation to when it made its termination decision, and from whom Regis obtained this information.

To begin, the termination letter sent to Bryson was dated March 10, 2004, the date that Bryson was supposed to return to work. The date stamp on the Release Form, however, shows that Regis did not receive it until March 15, 2004, five days *after* it terminated Bryson. (JA 243.) There does not appear to be any dispute among the parties that Regis did not receive the Release Form until March 15, and there is no contention by Regis that it knew the precise contents of the Form prior to that date. Indeed, while questioning Bryson at her deposition, Regis's counsel pointed out the date stamp, saying, "That's got a receipt date of March 15, do you see that?" (JA 902.) Further proof that Regis did not have the Release Form in hand when it made its termination decision is Brooker Zollman's March 10, 2004 letter informing Bryson that she was effectively discharged. Brooker Zollman's letter does not refer to the Release Form at all, but merely states, "It has been brought to my attention that as of today your health care provider has not released you to return to work with or without restrictions." (JA 246.) Brooker Zollman does not explain how this information "ha[d] been brought to [her] attention," when it had been communicated to her, or by whom.

Thus, summary judgment is inappropriate because there remains a factual question regarding when Regis first learned that Bryson would be unable to return to work in relation to when it decided to terminate her.

Summary judgment is inappropriate for a second reason, namely, there is a question of fact about what role, if any, Sawyer played in the internal communications leading up to Bryson's discharge. Bryson testified that she never spoke with Brooker Zollman. But, Bryson testified that she left a voice message for Sawyer on March 8 to update Sawyer on her condition. The record does not disclose what exactly Bryson said in her voice message to Sawyer. Because Sawyer did not return her call, Bryson called Wilson on March 9. Bryson testified that she told Wilson that she was capable of standing in increments of fifteen to twenty minutes with breaks of three to four minutes in between and that she was prepared to do any kind of seated work. Wilson told her that she did not think either "corporate or [Sawyer] would go for that." (JA 906.) Thus, the record shows that where Regis did not receive the Release Form until March 15, the only people who could have informed Brooker Zollman about Bryson's medical status were Sawyer or Wilson, or as yet

unidentified third parties to whom Sawyer or Wilson communicated the information, who then imparted it to Brooker Zollman.[7]

In light of the record evidence showing that Regis did not possess the Release Form when it terminated Bryson on March 10, ascertaining the nature of Sawyer's role, if any, in Bryson's termination is important.[8]  The record in this case is replete with testimony that Sawyer was angry that Bryson took FMLA leave during the busy Christmas season and that she told other Supercuts employees that she would see to it that Bryson never came back to work.  Sawyer told Richardson that she was upset that Bryson was taking time off and that Bryson "would not be able to keep her job when she got back." (JA 953.)  Hundley testified that Sawyer ridiculed Bryson's injury and said "that bitch [referring to Bryson] won't be at another [managers'] meeting." (JA 961.)  Bryson herself testified that she had the impression that Sawyer was going to fire her as a result of her leave taking.

In *Hite v. Vermeer Manufacturing Company*, 446 F.3d 858, 866 (8th Cir. 2006), the Eighth Circuit stated that "where an ultimate decisionmaker relies on the discriminatory comments of another employee or supervisor in deciding to terminate the employee, the employee may be able to establish a causal connection."  The *Hite* court held that there was sufficient evidence to support the jury's verdict in favor of plaintiff Hite.  The evidence at trial established that Hite's supervisor threatened her with termination if she continued to use FMLA leave and singled her out for harassment and disciplinary measures.  *Id.* at 862-63.  The person ultimately responsible for discharging Hite testified that Hite's supervisor had recommended her termination.  *Id.* at 866-67.  Even though the ultimate decisionmaker could not recall whether he and Hite's supervisor discussed her leave-taking during their conversation about her potential termination, the Eighth Circuit held that "the jury could infer that [the ultimate decisionmaker] did rely, at least in part, on Hite's FMLA usage in terminating her."  *Id.* at 867.

Here, the record is unclear as to what exactly Regis relied upon in making the decision to release Bryson from her employment with Supercuts.  Further factual development in the district court is necessary to determine when Regis decided to terminate Bryson, on what basis it made that decision, and whether Sawyer played any part in the decisionmaking process.  Accordingly, we reverse the grant of summary judgment for Regis on Bryson's FMLA-retaliation claim, and remand for further proceedings.

## C.      Bryson's Disability-Discrimination and Disability-Retaliation Claims

Bryson challenges the district court's grant of summary judgment to Regis on her disability-discrimination and retaliation claims, both brought under the KCRA.  The district court held that Bryson did not establish that she is "disabled" within the meaning of the statute because the impact of her knee condition was temporary in nature, and because she did not show that she is substantially restricted in the major life activities of walking, standing, and working.

---

[7]At her deposition, Sawyer testified that she was not aware of any conversation between Bryson and Wilson, in which Bryson asked to perform seated work.  (JA 1099.)

[8]The record establishes that Sawyer was not completely removed from the events surrounding Bryson's discharge.  Sawyer testified that she received a voice message from a Regis administrator named Julie Juvie telling her that Bryson's FMLA leave had expired and that a letter would be going out to her (i.e., Bryson).  At the direction of her regional supervisor, Sawyer prepared an "Employee Separation Form," dated March 11, 2004.  (JA 290, 992-93.)  The record does not explain what the "Employee Separation Form" is used for or why it was necessary for Sawyer to complete it if Regis already knew about Bryson's termination and was responsible for carrying it out.

Below we set forth the applicable legal standards governing Bryson's claims and discuss first her disability-discrimination claim and then her retaliation claim.

1.      *Applicable Legal Standards*

The language of the KCRA, Ky. Rev. Stat. § 344.010 *et seq.*, mirrors that of the ADA; consequently, claims brought under the KCRA are interpreted consistently with the standards developed under the ADA. *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 190-91 (2002) (stating that the KCRA "is construed consistently with the ADA"); *Brohm v. JH Props., Inc.*, 149 F.3d 517, 520 (6th Cir. 1998) (same).

As a threshold issue, a disability-discrimination plaintiff must establish that she suffers from an impairment that qualifies as a "disability." A person is defined as having a "disability" within the meaning of the ADA if she has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."[9] 42 U.S.C. § 12102(2)(A).

"Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota*, 534 U.S. at 195. A claimant must also establish that her impairment "substantially" limits one or more "major life activities." *Id.* at 196. According to the EEOC regulations promulgated pursuant to the ADA,

> 'substantially limited' means 'unable to perform a major life activity that the average person in the general population can perform'; or 'significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'

*Id.* at 195-96 (quoting 29 C.F.R. § 1630.2(j)).

In *Toyota*, the Supreme Court held that the requirement that an impairment "substantially" limit a major life activity "precludes impairments that interfere in only a minor way . . . from qualifying as disabilities." *Id.* at 196. The Court also held that the phrase "major life activities" refers "to those activities that are of central importance to daily life." *Id.* Whether a claimant qualifies as having a disability requires an individualized inquiry. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).

2.      *Bryson's Disability-Discrimination Claim*

One of the factors that is relevant to determining whether an impairment amounts to a disability is whether it is "permanent or long-term." *Toyota*, 534 U.S. at 198 (stating that "[t]he impairment's impact must also be permanent or long-term") (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)).

Here, the record evidence casts doubt on whether Bryson's knee condition satisfies this requirement. In a letter to Bryson's counsel, dated May 27, 2005, Dr. Hester opined that, "As of January 18, 2005, it was felt that [Bryson's] knee had improved considerably and was well resolved." (JA 186.) He reiterated this view at his deposition in August 2005, where he testified

---

[9]A disability-discrimination claimant may also establish that she is "disabled" by showing "a record of such an impairment" or that she is "regarded as having such an impairment." 42 U.S.C. § 12102(2)(A). Bryson did not plead these alternative ways of establishing she is disabled in her complaint and she does not rely on them before this Court.

that Bryson's RSD had been brought "pretty well under control" by January 2005 and that Bryson was not under any restrictions in terms of her ability to work as of that time.  (JA 183-84.) Furthermore, at her deposition, Bryson testified that she did not refrain from engaging in any activities as a result of her RSD: "I can perform everything—actually, the only thing that it restricts me from, it makes it harder to sleep.  Basically . . . I still do everything else."  (JA 153.)

The testimony of Dr. Hester and Bryson herself suggests that the impairment caused by Bryson's knee surgery and her RSD was not permanent or long-term.  Nonetheless, because Bryson also testified that her RSD condition is "chronic" and "will never go away," (JA 950), and because Dr. Hester testified that RSD "develops into quite a debilitating condition," (JA 183), we proceed to evaluate whether Bryson has adduced sufficient evidence to show that she is substantially limited in the major life activities of standing, walking, and working.

### (a)          Standing and Walking

An "impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation" under the ADA.  *Mahon v. Crowell*, 295 F.3d 585, 590-91 (6th Cir. 2002).  The record here shows that Bryson cannot stand or walk for as long as she was able to prior to her knee surgery and the onset of her RSD.  But, she is not altogether precluded from standing and walking either.  Indeed, Bryson testified that she can stand for fifteen to twenty minutes at a time and sometimes for "a[n] hour, an hour and a half, two hours . . . ."  (JA 931.)  Bryson simply cannot stand "all day like [she] used to."  (JA 931.)  This is insufficient to establish that she is substantially limited with respect to standing and walking.  *See Mahon*, 295 F.3d at 591 (holding that the plaintiff was not substantially restricted in his ability to sit, stand, bend, stoop, walk, climb, or lift even where the record established that the plaintiff's "back impairment causes him distress and limits him in performing some activities"); *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997) (stating that although the claimant "suffers an impairment that affects to some degree his ability to walk, he has not 'adduced sufficient evidence from which a factfinder reasonably could conclude that the nature and severity of his injury significantly restricted his ability to walk as compared with an average person in the general population'") (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

### (b)          Working

In *Sutton*, the Supreme Court held that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  527 U.S. at 493 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  The Court held that the petitioners' poor eyesight did not substantially limit their ability to work, even if it meant that they were precluded from working as airline pilots. *Id.*

Thus, it is not enough for Bryson to present evidence showing that she can no longer work as a Supercuts manager.  She must instead show that she is "significantly restricted in ability to perform either a class of jobs or a broad range of jobs in various classes."  29 C.F.R. § 1630.2(j)(3)(i).  Bryson has failed to meet this standard.  She has not established that her medical condition bars her from working in all jobs within the cosmetology field, or that it prevents her from holding a large number of jobs in other categories of employment. *See Olds v. UPS, Inc.*, 127 F. App'x 779, 782 (6th Cir. 2005) (per curiam) (stating that the plaintiff's "lifting restriction prevents him from working as a delivery driver and from performing other jobs at UPS specifically, but there is no evidence in the record that it prevents him from engaging in a broad class of jobs").  Moreover, the testimony of both Dr. Hester and Bryson contradict any such finding.  Dr. Hester testified that as of January 2005, Bryson was under no limitations with respect to her ability to work.  Bryson agreed, testifying that she "can still work full-time."  (JA 938.)

We therefore affirm the district court's grant of summary judgment to Regis on Bryson's disability-discrimination claim.

3.      *Bryson's Retaliation Claim*

The district court granted summary judgment to Regis on Bryson's disability-retaliation claim because it concluded that where Bryson was not "disabled," she could not show that Regis retaliated against her on the basis of her disability.  The district court erred.

A plaintiff may prevail on a disability-retaliation claim "even if the underlying claim of disability fails." *Soileau v. Guilford of Me.*, 105 F.3d 12, 16 (1st Cir. 1997); *accord Cassimy v. Bd. of Educ.*, 461 F.3d 932, 938 (7th Cir. 2006); *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) ("Unlike a claim for discrimination under the ADA, an ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA."); *Heisler v. Metro. Council*, 339 F.3d 622, 630 (8th Cir. 2003).

Bryson's disability-retaliation claim is evaluated under the same tripartite *McDonnell Douglas* burden-shifting framework as her FMLA-retaliation claim.  First, Bryson must establish a prima facie case.  Keeping in mind that the prima facie showing a plaintiff must make will vary depending upon the unique facts of each case, *Macy*, 484 F.3d at 365, we apply the formulation we have previously used, requiring an ADA-retaliation plaintiff to show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action.  *Penny*, 128 F.3d at 417.

Bryson argues that she engaged in statutorily protected conduct by requesting an accommodation, namely, to perform seated work, including cutting hair from a seated position.  Regis does not dispute that Bryson satisfies the first two elements of the prima facie showing, and contends only that Bryson has failed to show a causal connection.

We disagree.  Bryson was terminated just two days after leaving a voice message with Sawyer asking if she could perform seated work, and one day after conveying the same request to Wilson.  Moreover, Bryson testified that Wilson responded by saying that she did not think either "corporate" or Sawyer would permit Bryson to do seated work.  Bryson has therefore presented sufficient evidence to raise the inference that she was unlawfully retaliated against on the basis of her request for an accommodation.  *Macy*, 484 F.3d at 365 ("The key question [at the prima facie stage] is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination.").

As we have already discussed, Regis has presented evidence from which a factfinder could conclude that it terminated Bryson for a legitimate, non-discriminatory reason, i.e., that Bryson was unable to return to work at the expiration of her leave period.  Nonetheless, we reverse the district court's grant of summary judgment for Regis on Bryson's disability-retaliation claim because, just as we concluded with respect to Bryson's FMLA-retaliation claim, the record reveals questions of fact regarding whether Regis's explanation for its termination decision is pretextual.

Where Bryson requested to perform seated work, where Wilson expressed skepticism that such a proposal would be favorably received, and where Bryson was terminated without ever having received a definitive response to her request from anyone—not Sawyer, not Wilson, and not anyone at Regis—we cannot conclude that Regis is entitled to summary judgment as a matter of law.  Rather, further factual development in the district court is necessary to ascertain what role, if any, Sawyer and Wilson played in Bryson's termination, and whether possible opposition to Bryson's request for an accommodation was a motivating factor in her termination.

**D.      Bryson's Motion for Partial Summary Judgment on her Disability-Discrimination Claim**

As described in part C.2 above, Bryson has not presented evidence showing that she is disabled within the meaning of the ADA and the KCRA. Therefore, the district court correctly denied Bryson's motion for partial summary judgment on this claim.

## III. CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's grant of summary judgment on Bryson's FMLA-retaliation and disability-retaliation claims and **REMAND** for further proceedings. We **AFFIRM** the district court's grant of summary judgment to Regis on Bryson's disability-discrimination claim and **AFFIRM** the district court's denial of Bryson's motion for partial summary judgment.