NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0796n.06

No. 11-1743

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jul 23, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| ROBERT J. WINTERHALTER, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| DYKHUIS FARMS, INC., | ) | O P I N I O N |
| | ) | |
| *Defendant-Appellee*. | | |

BEFORE:     BOGGS and COLE, Circuit Judges; OLIVER, Chief District Judge.[*]

COLE, Circuit Judge.  Plaintiff-Appellant Robert J. Winterhalter sued Defendant-Appellee Dykhuis Farms, Inc. for retaliation against, and interference with, Winterhalter's exercise of rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*  Dykhuis Farms terminated Winterhalter's employment on the day that Winterhalter was scheduled to return from FMLA leave, allegedly due to economic hardship and Winterhalter's status as the highest-paid and lowest-performing of the workers in his unit.  The district court granted summary judgment in favor of Dykhuis Farms.  For the reasons that follow, we AFFIRM.

---

[*] The Honorable Solomon Oliver, Jr., Chief United States District Judge for the Northern District of Ohio, sitting by designation.

## I. BACKGROUND

Dykhuis Farms is a family-owned pig farm with multiple facilities located throughout Michigan and Indiana. Winterhalter began working there in February 2007 as manager of the breeding herd, which entailed supervising sow-breeding operations at four different farms. He reported to Erin Ehinger and was paid an annual salary of $55,000. In March 2009, Dykhuis Farms converted its Shamrock Farm facility from raising male pigs for market to raising young female pigs for breeding, and transferred Winterhalter to manage that herd only. Winterhalter's salary remained the same after the transfer. At Shamrock Farm, Winterhalter reported to Brandon Hill and supervised two employees: Dan Dalman, the previous manager of Shamrock Farm who received an annual salary of $45,000; and Tim Hocthanner, a farmhand who received an hourly wage that amounted to less than $30,000 in earnings in 2009. In April 2009, Hill began documenting situations in which he was dissatisfied with Winterhalter's performance. On May 1, 2009, Winterhalter fell, injuring his rotator cuff and hip, but continued to work throughout the summer and into the fall.

During this time, Dykhuis Farms's economic position became increasingly precarious. In the summer of 2009, Dykhuis Farms's bank informed Dykhuis Farms that it must take "immediate and drastic measures to improve its financial performance, including immediately reducing the size of its operations and overhead." In response, Dykhuis Farms laid off thirteen full-time employees over a seven-month period and reduced the sizes of its breeding herds. As part of this scheme, it gradually reduced the size of the herd at Shamrock Farm by twenty-seven percent between late September 2009 and early January 2010.

As Winterhalter's injury failed to improve over the summer, he decided to undergo surgery to repair the damage to his rotator cuff. Winterhalter gave Dykhuis Farms notice and went on FMLA leave beginning October 12, 2009, shortly after Dykhuis Farms had begun the process of reducing the herd at Shamrock Farm. While Winterhalter was on leave, the management at Dykhuis Farms began discussing "laying [Winterhalter] off due to lack of work at Shamrock and the rest of the farm." Upon determining that "Dan and Tim were doing great" in Winterhalter's absence, Dykhuis Farms decided to go through with the lay-off.

On the day Winterhalter was scheduled to return from FMLA leave, he was asked to come to the farm to retrieve a return-to-work authorization form. When Winterhalter arrived, he received a termination letter informing him that Dykhuis Farms "has eliminated your position as Manager of the Shamrock Unit." The letter explained that "the primary reason for this job termination is for financial reasons," but also referenced his "job performance" and verbal warnings that he had received "over the past two and a half years." Two weeks after Dykhuis Farms terminated Winterhalter, it posted internally for a position managing the raising of pigs for market, which paid $12.00 per hour. It did not notify Winterhalter of this new position.

Winterhalter filed a complaint in the United States District Court for the Western District of Michigan on April 23, 2010, alleging that Dykhuis Farms terminated him because he took medical leave, in violation of the FMLA's retaliation and interference provisions. Dykhuis Farms responded that it terminated Winterhalter for economic reasons and because he was the lowest-performing and highest-paid of the employees in his unit. The district court granted Dykhuis Farms's motion for summary judgment on both the retaliation and the interference claims. This appeal followed.

- 3 -

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment de novo.  *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012).  Summary judgment is proper when, based on the totality of the record, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court may not "weigh the evidence or determine the truth of any matter in dispute," but must "draw all inferences from the record in the light most favorable to the nonmoving party."  *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).  "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)) (alteration in original).  Because employer-defendants "will often be able to respond only through the testimony of their employees," courts may consider the uncontradicted affidavits or testimony of a defendant-employer's employees.  *Id.* at 598.

### B.  FMLA Claims

The FMLA provides two avenues to vindicate the rights of an employee who alleges that he has been wrongfully terminated as a consequence of taking FMLA leave: the "entitlement" or "interference" theory and the "retaliation" or "discrimination" theory.  *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003).  The "retaliation" or "discrimination" theory prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for

opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The "entitlement" or "interference" theory derives from the FMLA's creation of substantive rights. It prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of" FMLA rights, *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 87 (2002) (quoting 29 U.S.C. § 2615(a)(1)), and entitles any eligible employee who takes FMLA leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment," 29 U.S.C. § 2614(a)(1).

These provisions do not create a greater right to reinstatement or protection against termination than the employee would receive if he had not taken FMLA leave. *Arban*, 345 F.3d at 401. Therefore, an employer may dismiss an employee who has taken FMLA leave, but only "if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

### 1. FMLA Retaliation/Discrimination

Although Winterhalter alludes to a "mixed motives" theory of FMLA retaliation, he brings his case under a theory of indirect discrimination, invoking "the tripartite burden-shifting framework" announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Under this rubric, Winterhalter must present sufficient evidence to establish his prima facie case, after which the burden shifts to Dykhuis Farms to show a legitimate, non-discriminatory reason for terminating Winterhalter. *Id.* If Dykhuis Farms is successful, the burden shifts back to Winterhalter to demonstrate that Dykhuis Farms's stated

reason is pretextual. *Id.* The parties do not dispute that Winterhalter has satisfied the elements of his prima facie case. Therefore, our inquiry will focus exclusively on whether a genuine dispute of material fact exists regarding whether Dykhuis Farms and Winterhalter met their respective burdens under the second and third *McDonnell Douglas* prongs.

### a. Dykhuis Farms's Proffered Reasons for Terminating Winterhalter

Dykhuis Farms advances two legitimate reasons unrelated to the exercise of FMLA rights for terminating Winterhalter: first, that severe economic hardship forced it to eliminate numerous positions throughout its organization, including one at Shamrock Farm; and second, that Winterhalter was the highest-paid and lowest-performing worker at Shamrock Farm, prompting Dykhuis Farms to select him for termination.

Dykhuis Farms has produced sufficient evidence to support its assertions regarding economic hardship. The November 2009 Employee Newsletter ("the Newsletter") corroborates Dykhuis Farms's claim that it was taking "immediate and drastic measures to improve its financial performance." The Newsletter states that Dykhuis Farms is "starting [a] sow reduction plan as part of a long range strategy" and ends with the ominous note: "We are not bankrupt. That is an ugly rumor that needs to be stopped."

Dykhuis Farms has also produced sufficient evidence to support its assertions regarding Winterhalter's pay and performance. Dykhuis Farms showed Winterhalter's poor performance through the deposition testimony of both of his previous supervisors, notes that each supervisor took documenting Winterhalter's performance deficiencies, and a 2008 performance evaluation, which described Winterhalter as performing below standards in three of the six areas reviewed.

Winterhalter does not dispute that he received a substantially higher salary than the other two workers at Shamrock Farm.

### b. Winterhalter's Showing of Pretext

Winterhalter may establish pretext by showing "either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 529 (6th Cir. 2005). Winterhalter tries to show that Dykhuis Farms's proffered reasons have no basis in fact by challenging Dykhuis Farms's assertion of economic hardship. Winterhalter challenges Dykhuis Farms's portrayal of its economic circumstances by focusing on a narrower time frame: Instead of examining the seven-month period in which Dykhuis Farms claimed to undergo the restructuring that caused it to lay off thirteen workers, Winterhalter focuses on the two months immediately preceding and immediately following his termination. During that four-month period, Dykhuis Farms terminated only four employees, including Winterhalter, but hired six. He urges the Court to infer from the number of new hires during that four-month period that Dykhuis Farms made a similar number of new hires throughout its purported workforce reduction. But Winterhalter makes no showing of any additional hires by Dykhuis Farms during the remaining months in which Dykhuis Farms terminated workers, and further, he must concede that five of the six newly hired employees assumed only part-time or seasonal positions, while the thirteen terminated employees left full-time positions.

Beyond these hirings and firings, Winterhalter challenges the economic-hardship assertion via the Newsletter's moments of optimism—its celebration of "rising hog prices" and announcement

that "it looks like we will turn profitable early next year." Taken as true, however, none of this evidence creates a genuine dispute about the facts material to Dykhuis Farms's assertion of economic hardship: Winterhalter does not respond to the directive from the bank for Dykhuis Farms to take "drastic measures to improve its financial performance," nor does he put forth any financial documents suggesting that Dykhuis Farms had turned profitable earlier than reported. Further, the Newsletter's moments of optimism stand in stark contrast to its general description of cost-cutting measures. Thus, Winterhalter's arguments do not create a genuine dispute as to whether Dykhuis Farms's assertion of economic hardship has a firm basis in fact.

Nor can Winterhalter show that pay disparities and his poor performance did not actually motivate his termination. He argues that emails among Dykhuis Farms's management discussing whether Winterhalter's colleagues were "getting stuff done" without him create a genuine dispute as to whether the management impermissibly considered Winterhalter's leave when making their termination decision. But merely taking Winterhalter's leave as a factor in the termination decision does not defeat summary judgment in an indirect-discrimination claim—Winterhalter would have to have brought his claim under a mixed-motive theory to avail himself of this argument. Therefore, the mere possibility that Winterhalter's FMLA leave constituted a factor in Dykhuis Farms's decision to terminate him does not create a genuine dispute of material fact regarding whether his high pay and poor performance actually motivated the termination.

Finally, Winterhalter cannot show that pay disparities and performance deficiencies were insufficient to motivate his termination. He attempts to persuade the court that, while his own performance may have been lacking, his colleagues struggled even more. He supports this assertion

with his second-hand knowledge that Dalman had been demoted due to poor performance, and with evidence that he had more experience with raising young female pigs than the other two workers at Shamrock Farm. Taken as true, this evidence does not raise a genuine dispute regarding Winterhalter's relative performance at the time he was fired. While Dalman's performance may have been poor in the past, Winterhalter puts forth no evidence that Dalman's performance deficiencies continued. Further, given Dykhuis Farms's uncontested assertion that Hill took on Winterhalter's supervising responsibilities, Dalman's and Hocthanner's comparative levels of experience did not make them ill-suited to the jobs that they held. Thus, Winterhalter does not put forth affirmative evidence that he performed better than, or even as well as, his colleagues in the positions that each held. Coupled with the extra expense of retaining Winterhalter as opposed to either of the other two, we see no genuine dispute as to the sufficiency of these facts to support Winterhalter's discharge.

### 2. FMLA Entitlement/Interference

Winterhalter asserts that, by terminating him at the end of his FMLA leave, Dykhuis Farms interfered with his FMLA entitlement "(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment," 29 U.S.C. § 2614(a)(1). As a threshold matter, Winterhalter bears the burden of establishing by a preponderance of the evidence that he was entitled to restoration. *See Arban*, 345 F.3d at 401.

Winterhalter has not created a genuine dispute of material fact as to whether he was entitled to restoration. As explained above, we find no genuine dispute of fact regarding whether Dykhuis

Farms was going through a period of serious economic hardship at the time it terminated Winterhalter. Nor do we find a genuine dispute regarding whether Winterhalter was the highest-paid or the lowest-performing of the three workers at Shamrock Farm. The district court correctly ruled that Winterhalter cannot show that he was entitled to restoration to his position or any similar one and thus Dykhuis Farms is entitled to summary judgment on Winterhalter's FMLA interference claim.

## III. CONCLUSION

For the reasons stated above, we AFFIRM.