NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0290n.06

No. 14-5609

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 17, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| GENE PARKS, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UPS SUPPLY CHAIN SOLUTIONS, INC., | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| **Defendant-Appellee.** | ) | |
| | ) | |

BEFORE: GRIFFIN and STRANCH, Circuit Judges; STEEH, District Judge.[*]

**STEEH, District Judge.** Plaintiff Gene Parks appeals from the United States District Court for the Eastern District of Kentucky's grant of summary judgment in favor of his employer, defendant UPS Supply Chain Solutions ("UPS"). Parks filed this action alleging retaliation and interference theories under the Family and Medical Leave Act ("FMLA") when he was terminated after requesting a leave of absence for neck surgery. Parks also alleges that UPS failed to accommodate his disability under the Kentucky Civil Rights Act ("KCRA") by refusing to grant him leave to have surgery. The district court granted UPS's motion for summary judgment and Parks appeals. We **AFFIRM** the district court's grant of summary judgment for UPS.

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

## I.  BACKGROUND

### A.  Factual Background

Mr. Parks was hired by UPS in February, 1999 to work at its Hebron, Kentucky campus as a material handler.  Parks drove a forklift, moved boxes, picked products and controlled inventory. When a material handler puts a box away in the warehouse, the location must be accurately recorded in the computer system so "pickers" can easily find and retrieve that package later.

From 2003 through 2009, Parks requested and was approved for FMLA leave on six separate occasions.  Most of these requests were for intermittent leave, were to care for his wife as opposed to being for his own health issues, and were at a time when Parks reported to a different supervisor. In 2009, Parks began reporting to Jennifer Valdez.  At that time, Parks's FMLA paperwork indicated that he may need surgery to address neck pain caused by a herniated disc.  In February of 2010, Parks was approved for intermittent FMLA leave, which allowed him to take up to twelve weeks of leave per year to cope with flare-ups or to receive medical treatment related to his neck pain.  His last FMLA certification, submitted in January 2011, also indicated that Parks would likely undergo surgery in the future, at which time he would require continuous leave to recover from the procedure.

Parks received two warnings for failure to meet productivity requirements in May of 2010, and claimed that his health conditions were preventing him from working as quickly as he should. That month, Parks submitted updated FMLA paperwork to HR reflecting his limited ability to drive a forklift, bend, stoop and lift.  UPS approved this request and updated his FMLA status to reflect the new restrictions.  A year later, on May 17, 2011, Parks received a written final warning for

quality errors for putting boxes away upside down. In response, Parks explained to Valdez and Tony Lovelace, his other supervisor, that he was not as fast as he used to be due to his neck condition. Both supervisors advised Parks that the FMLA approval only covers missed time, not performance errors, and recommended that he submit new FMLA paperwork if he felt he could not do his job. Parks did not submit such paperwork.

On May 27, 2011, the Friday before the Memorial Day weekend, Parks left work due to a flare-up of his medical condition. He returned to work after the holiday on Tuesday, May 31, and alleges he told his supervisors that he needed extended FMLA leave in order to have neck surgery which was scheduled by his doctor for June 16, 2011. Lovelace and Valdez did not recall being informed of the surgery that morning, although they acknowledged they were aware of his general need for surgery in the future. Parks was terminated from his employment one to two hours after he says he notified Lovelace and Parks of his need for FMLA leave, allegedly due to a performance issue. Along with his employment, Parks lost his health insurance and claims he was forced to cancel his surgery.

UPS's "progressive discipline policy" addresses various categories of employee infractions, including sub-par performance, safety violations, misconduct, rules violations, tardiness and insubordination. Supervisors issue informal verbal warnings to first time offenders, then issue written first, second, third and final warnings for subsequent infractions. Warnings "roll-off" the employee's record after a given amount of time, usually one year, and do not carry over from one category to another.

3

Parks had a number of write ups over the course of his employment. Focusing only on the relevant time period of approximately one year prior to his termination on May 31, 2011, Parks had the following performance issues and corresponding discipline:

- May 17, 2010, Parks received a verbal performance warning for failure to meet productivity standards and for having large gaps of time between restocking tasks.

- May 27, 2010, Parks received a first written performance warning for failure to meet productivity standards.

- October 22, 2010, Parks received a final written warning for conduct/behavior arising out of an incident where he was considered to be insensitive in approaching co-workers from UPS's Honeywell facility when the loss of that contract was announced.

- December 15, 2010, Parks received a first written performance warning for quality errors for putting cartons away on a shelf, but failing to log the location into the computer (a "Status 65" error).

- January 7, 2011, Parks received a second written performance warning for quality errors when an audit revealed he physically put away four boxes, but the system indicated the boxes still needed to be put away. This is referred to as a "Status 10," and the warning indicated it was "one of several examples."

- May 11, 2011, Parks received a third written performance warning for quality errors for putting six boxes away upside down.

- • May 17, 2011, Parks received a final written performance warning for quality errors for putting seven boxes away upside down.

- • During the week of May 23, 2011, Parks did not put a box in the location he entered into the computer system. The error was discovered by Valdez during the week of May 23, 2011, but was not documented until May 31, 2011.

- • May 31, 2011, Parks committed a "Status 65" error.

Each of the written warnings indicated that "future issues will result in discipline up to and including termination." Most of Parks' performance warnings were for quality errors, and according to Valdez, he declined all retraining opportunities that his supervisors offered to him.

On May 31, 2011, Valdez began the process of issuing Parks's discipline for the two most recent performance quality errors. At this time, Valdez recognized that Parks was already on a final written warning for performance quality errors. After conferring with Lovelace, Valdez recommended to HR Representative Julie Welch that Parks's employment be terminated. The decision to terminate was approved by HR Manager Michelle Chavez, who made the decision based on Parks' discipline history. Chavez was not aware of Parks's FMLA certification.

Parks was terminated at a meeting attended by Valdez, Lovelace and Welch. During the meeting, Parks requested that they continue to employ him until he had his surgery so he could receive benefits. UPS refused the request and went forward with the termination.

**B. Procedural Background**

Parks filed his complaint in the Boone County, Kentucky, Circuit Court on September 13, 2011. UPS removed the case to the United States District Court for the Eastern District of Kentucky

on December 27, 2011. The District Court granted UPS's motion for summary judgment on Parks's claim for FMLA retaliation, finding that there was not sufficient evidence in the record for a jury to find that UPS's proffered reason for discharge was pretextual. The court denied summary judgment as to Parks' claims for FMLA interference and failure to accommodate under the KCRA due to an issue of fact as to whether Parks requested FMLA leave or an accommodation prior to his discharge.

UPS filed a motion for partial reconsideration, seeking summary judgment as to the interference and failure to accommodate claims. The court granted the motion on April 16, 2014 and dismissed Parks's complaint. Parks timely filed this appeal.

## II. ANALYSIS

### A. Standard of Review

This Court conducts a *de novo* review of the district court's grant of summary judgment. *Thom v. American Standard, Inc.*, 666 F.3d 968, 972 (6th Cir. 2012). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448-49 (6th Cir. 2012) (citation omitted). "In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most

favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

**B. FMLA Retaliation**

The FMLA entitles an eligible employee to as many as twelve weeks of leave during any twelve month period if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). There is no dispute in this case that Parks is an eligible employee under the FMLA, or that his herniated disc constitutes a "serious health condition."

The retaliation theory of recovery under the FMLA is based on discrimination, and asks whether the employer took the adverse action because of a prohibited reason. The FMLA makes it unlawful for any employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2). "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

Absent direct evidence of unlawful conduct, FMLA retaliation claims are analyzed under the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, if the plaintiff makes a prima facie showing, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its

actions which, *if believed by the trier of fact*, would support a finding that unlawful [retaliation] was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55, and n.8 (1981)). Defendant's burden is one of production, not persuasion, and can involve no credibility assessment. *Id*. at 509. If the defendant is successful, the burden "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson*, 498 F.3d at 570.

### 1. Prima Facie Case

To establish a prima facie case of FMLA retaliation, Parks must establish by a preponderance of the evidence: (1) that he engaged in an activity protected under the FMLA; (2) that his exercise of his protected rights was known to the defendant; (3) that he suffered an adverse employment action; and (4) that a causal connection exists between the protected activity and the adverse employment action. *Arban v. West Pub. Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). The only disputed factor of Parks's prima facie case is whether there is a causal connection between his request for FMLA leave and his discharge. For purposes of argument, UPS is willing to concede that Parks meets this burden and has established a prima facie case of retaliation.

### 2. Legitimate Nondiscriminatory Reason

The burden shifts to UPS to present evidence of a legitimate, non-discriminatory reason for terminating Parks. UPS argues that it terminated Parks not in retaliation for exercising his right to FMLA leave to have surgery, but because he committed two further performance quality errors while he was on a final written warning for performance quality. UPS supports its argument with admissible evidence which, if believed by the trier of fact, would support a finding that UPS had a

legitimate, non-discriminatory reason for terminating Parks. As the district court wrote in its opinion, "[c]ourts have held that '[p]oor performance is a legitimate, non-discriminatory reason for terminating a person's employment' and is sufficient to satisfy [UPS]'s initial burden under the *McDonnell-Douglas* framework." (Mem. Op. and Ord., p. 18 (quoting *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 546 (6th Cir. 2008))).

### 3. Pretext

UPS has articulated a legitimate, nondiscriminatory reason for Parks's discharge, namely repeated performance quality errors; thus the burden shifts back to Parks to show that a genuine issue of material fact exists concerning whether UPS's stated reason was a pretext for unlawful retaliation. To establish pretext, Parks must prove "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009). "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

Parks, therefore, could establish pretext if he demonstrated option one—that the performance errors leading to his termination had no basis in fact, showing that impermissible reasons were the true basis for his termination. But even if he committed the performance errors, Parks could prevail by showing option two—UPS terminated him for an impermissible reason rather than a legitimate one, or option three—the performance errors, though they occurred, were insufficient to warrant

discharge. To establish pretext through these latter two options, Parks is not required to prove that the proffered reason was objectively baseless; falsity is satisfied by proof that the reason did not actually motive UPS's action.

### a. Performance Errors had no Basis in Fact

The final performance errors that precipitated Parks's termination included not putting a box in the location that he entered into the UPS computer system and putting a box on a shelf to replenish stock, but failing to log the physical location of the box in the computer system. At his deposition, Parks opined that UPS's system of attributing performance errors to employees is flawed:

> The system is flawed that they use, in my mind and in a lot of other people's minds, because I can put a box in a location, I can scan it into that location, I can drive away. Someone could come along and move that box. It could fall down. They may not remember where they put it at, where it come from. They can put it somewhere else. My name is on that box.

(Parks 12/28/12 Dep., pp. 28-29).

The Sixth Circuit has adopted a version of the "honest belief rule," whereby an employer cannot be held liable if it demonstrates that it had an honest belief in its justifications based upon reasonable reliance "on the particularized facts that were before it at the time the decision was made." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). This is true even if the employer's decision is ultimately found to be based upon incorrect facts. *See, e.g., Blizzard v. Marion Technical College*, 698 F.3d 275, 285-86 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 2359 (2013). "The key inquiry in assessing whether an employer holds such an honest belief is 'whether the employer made

10

a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (quoting *Smith*, 155 F.3d at 807).

An employee cannot avoid summary judgment by challenging an employer's honest belief that he deserved discipline with hypothetical theories, conjecture, or an unsupported denial of wrongdoing. *See Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 570 (6th Cir. 2009); *Lattimore v. Wild Flavors, Inc.*, 09-Civ-023, 2012 WL 208078, *13 (E.D. Ky. Jan. 23, 2012); *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 502-03 (6th Cir. 2009). "To overcome the employer's invocation of the honest belief rule, the employee 'must allege more than a dispute over the facts upon which [the] discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action.'" *Blizzard*, 698 F.3d at 286 (quoting, *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)).

Ms. Valdez relied on UPS's internal audit procedure and computer records to determine that one box had been physically misplaced, meaning that it was not in the location reflected in the computer, and that another box had not been put away systematically, meaning its location was not recorded in the computer system. While Parks takes issue with the fairness of UPS's tracking system, especially the possibility for blame to be placed on the wrong employee, this criticism does not rebut Valdez' honest belief that Parks was the one who committed the errors. Parks has not offered any evidence from which a reasonable fact finder could conclude that Valdez's belief that Parks committed the performance errors was not honestly held.

11

### b. Performance Errors Were Insufficient to Motivate Discharge

In an attempt to show that his performance errors were insufficient to merit termination, Parks points to other employees who he alleges were not discharged although they were similarly situated. Before the Court can make a comparison, Parks must demonstrate that the comparables were similarly situated in all relevant respects and that they engaged in acts of comparable seriousness. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012). Courts will assess certain factors in making this determination, such as whether the other employees have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating circumstances that would distinguish their conduct or the employer's response. *Ercegovich*, 154 F.3d at 352.

The Court first notes that Parks compares himself to employees who had different discipline issues than the performance errors that prompted his termination. Dona Malott and Bill Martin were each given a final written performance warning for conduct/behavior for hiding from management toward the end of their shifts to avoid being assigned new tasks. Parks also received a final written warning for a conduct/behavior issue in October of 2010, however this discipline was separate from his performance quality issues and did not support his termination. If anything, the evidence shows that Parks was treated the same as Malott and Martin in that each of them had a final written warning for conduct/behavior, and none of them was terminated.

Parks refers to a number of other employees who made similar performance errors as he, but were allegedly treated more favorably. For example, Cathie Harms made seventeen Status 10

offenses in one month and was not terminated. However, Harms received only two warnings—a verbal warning for nine Status 10s and a first written warning for eight Status 10s. Similar to Harms, Parks was also given two written warnings for groups of errors occurring close together in time, instead of having them each written up separately.

Parks asserts that other employees with performance issues were put on a Performance Improvement Plan ("PIP"), while he was not given this opportunity. Parks compares himself to Brenda Kinman who was placed on a PIP to improve her speed, and Cathie Harms, who was given retraining on three occasions to address quality issues. Valdez explained that PIPs were used to improve productivity or speed, while retraining was used for addressing performance quality errors. Therefore, a PIP would not have applied to Parks's performance quality errors. Valdez testified that Parks declined all of the re-training he was offered by his supervisors—a position to which Parks does not respond. This does not support Parks's argument that he was treated less favorably than similarly situated co-workers.

Just like Mr. Parks, Ms. Kinman was on a final written warning for performance quality errors when she was terminated. Parks tries to distinguish Kinman for receiving more write-ups than he did before she was terminated. Kinman's final written warning for performance errors indicates that she had six warnings on file prior to her final written warning. A seventh performance error resulted in Valdez recommending that Kinman be terminated. Parks also had six separate warnings on his record when he received his final written performance warning. Two further performance quality errors prompted his termination. To the extent Parks and Kinman may be considered similarly situated, there is no significant difference in the way they were treated by UPS.

13

### c. Performance Errors Did Not Motivate Discharge

In her May 31, 2011 email, Valdez wrote that she learned that Parks put away a container incorrectly "late last week," and that he had a Status 65 "this morning." "I was about to complete the write up. However, since Gene is already on a final written warning for performance, my recommendation is termination." Valdez testified consistently at her deposition, additionally stating that the two new errors had been discovered in an audit. (Valdez Dep. Pp. 82-83).

Parks attempts to show bias by arguing that the audits were at times described as random and at other times as targeted. The evidence shows that audits were conducted by pulling a small percentage of the cartons from every container and checking to make sure they were documented correctly. In this way, the audits were "random," and there is no evidence that Parks was targeted individually as the subject of an audit. There is no dispute that the last two performance errors occurred, only that UPS has not consistently explained the reason for Parks's termination. The record evidence reflects no material inconsistency as to the final two performance errors—the misplaced box late in the week of May 23, 2011 and the Status 65 error on the morning of the termination—which precipitated the discharge.

Parks next points to Lovelace's purported hostility towards employees who use FMLA leave. This theory, sometimes referred to as the "cat's paw" theory of liability, holds an employer liable when a "biased" intermediate employee's actions are a "causal factor [in] the ultimate employment action" such that the animus of the intermediate employee can be attributed to the employer. *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186, 1193 (2011); *Ercegovich*, 154 F.3d at 355 (holding that the remarks of a company official who did not make an ultimate employment decision

14

still provided proof of discriminatory motive when that official "was in a position to shape the attitudes, policies, and decisions of the division's managers").

In this case, Parks's evidence consists of his own testimony that Lovelace "frowned upon" employees taking FMLA leave and that he overheard negative statements made by Lovelace before 2010 regarding employees who took FMLA leave, all of which were directed at someone other than Parks. Parks also opined that Lovelace was frustrated by Parks taking leave to care for his wife in 2006 or 2007, and "would just clam up and walk away, shake his head and just walk away." Significantly, all of Lovelace's allegedly negative responses occurred several years before Parks's termination, and none was directed at Parks's FMLA requests for leave due to his own medical condition.

Parks also offers the sworn statement of Joe Chrisman, a former employee who took several FMLA leaves and claims he overheard Lovelace make unspecified negative comments about people who took FMLA leave. Any comment overheard by Chrisman occurred prior to 2009 when he was terminated by UPS for failing a mandatory drug test after having an accident on the job.

Generally, this court does not accord great weight to comments made over a year before the termination at issue. *See Rosso v. A.I. Root Co.*, 97 Fed. App'x 517, 520 (6th Cir. 2004). Such stale statements do not demonstrate pretext because they are too far removed from the decision-making process. *See Kahl v. The Mueller Co.,* 173 F.3d 855 (6th Cir. 1999) (table). Each of the negative reactions to FMLA leave attributed to Lovelace occurred well over one year before Parks requested FMLA leave for his surgery. Looking at the record as a whole, evidence of Lovelace's negative

attitude is too remote in time to give rise to an inference that Parks's termination was a result of animus that could be attributed to UPS.

Parks was terminated within hours after he purportedly gave notice of his intent to take FMLA leave. For purposes of establishing pretext, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.")). Of course, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)).

In this case, all of the other evidence that Parks points to—inconsistencies in testimony regarding the reason for his termination, similarly situated co-workers treated more favorably, and his supervisor's known hostility toward FMLA leave—do not hold up upon close examination. The decision of the district court granting defendant's motion for summary judgment on Parks's FMLA retaliation claim is affirmed.

## C. FMLA Interference

The interference theory of liability has its roots in the FMLA's creation of substantive rights, which do not permit an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]". 29 U.S.C. § 2615(a)(1). "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation

has occurred," regardless of the intent of the employer. *Arban*, 345 F.3d at 401. Unlike with the retaliation theory, the employer's motive is not relevant to a claim of interference.

To state a prima facie case of FMLA interference, the plaintiff must demonstrate that (1) he is an eligible employee; (2) the defendant is an employer as defined in the Act; (3) he was entitled to leave under the FMLA; (4) he gave the defendant notice of his intention to take leave; and (5) the defendant denied him FMLA benefits to which he was entitled. *Donald*, 667 F.3d at 761 (citations omitted). "As with retaliation claims, the *McDonnell Douglas* framework applies, meaning that the employer must respond to the prima facie case with evidence that 'it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee,' whereupon the plaintiff must show pretext." *Tillman v. Ohio Bell Telephone Co.*, 545 F. App'x 340, 351 (6th Cir. 2013) (quoting *Donald*, 667 F.3d at 762).

In the context of an interference claim, an employee may lawfully be dismissed, preventing him from taking FMLA leave, if the dismissal would have occurred regardless of the employee's request for, or taking of, FMLA leave. Since UPS has produced evidence of a legitimate, non-discriminatory reason for his termination, the burden shifts back to Parks to show that the stated reason was merely pretext. As already discussed in relation to the retaliation claim, Parks can point to nothing that would support a finding of pretext other than that he was terminated on the same day he claims to have requested medical leave. Temporal proximity alone is insufficient to establish that the employer's nondiscriminatory reason for discharging an employee was pretextual. *Donald*, 667 F.3d at 763.

No genuine issues of material fact exist as to Parks' claim for FMLA interference. The decision of the district court to grant defendant's motion for summary judgment is affirmed.

## D. KCRA Failure to Accommodate

The Kentucky Civil Rights Act prohibits discrimination because of disability against "a qualified individual" with a disability, K.R.S. § 344.040(1)(a)[1], 42 U.S.C. § 12112(a), and defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability". 42 U.S.C. § 12112(b)(5)(A). Claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence of discrimination.

Parks alleges that UPS discriminated against him "on the basis of his disability by failing to provide reasonable accommodation to his disability, including, but not limited to, the refusal to allow him medical leave to seek medical care for his medical condition." (Complaint para. 27). UPS acknowledges that it did not accommodate Parks's request for FMLA leave to have neck surgery, but argues that it was not obligated to make such accommodations because Parks was not "otherwise qualified" for his position due to his performance errors.

In a direct evidence claim brought under the ADA, the employee bears the burden of establishing that he or she is disabled, but "otherwise qualified" for the position, either without accommodation, or with a proposed reasonable accommodation. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (citing *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452

---

[1] The language of the KCRA provides the same protections as the ADA, so courts use the federal framework to analyze claims under the state statute. *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007).

(6th Cir. 2004)). The burden then shifts to the employer to prove that the proposed accommodation imposes an undue hardship upon the employer. For purposes of this appeal, UPS does not dispute that Parks is disabled. The issue is whether Parks was otherwise qualified for the position with his requested leave to have surgery, and if so, whether that request for leave imposed an undue hardship on UPS.

Parks was on a final written performance warning when he committed two additional performance errors—one before and one after his alleged accommodation request. UPS contends that Parks cannot satisfy his burden of proving that leave for surgery is an objectively reasonable accommodation because granting that accommodation request would have permitted him to use the request as a shield to avoid accountability for his performance errors.

Employers are not required to ignore performance errors committed by disabled employees who have requested an accommodation, so long as those performance errors do not relate to the employee's disability. *Whitfield v. Tennessee*, 639 F.3d 253, 261-62 (6th Cir. 2011). In this case, Parks has offered no evidence that his final two performance errors were related to his disability. Parks's request for leave as an accommodation was not reasonable because it would have required UPS to forgive the performance error committed before the request and ignore the error committed shortly after the request, neither of which is required by law.

The district court's grant of summary judgment on Parks's FCRA failure to accommodate claim is affirmed.

### III.  CONCLUSION

Parks fails to establish an issue of fact that UPS's legitimate nondiscriminatory reasons for terminating him were pretext.  Parks also fails to establish that he was otherwise qualified for his position such that UPS had a duty to provide a reasonable accommodation to his disability which included time off for surgery.  The district court's order granting UPS's motion for summary judgment is AFFIRMED.